Argued November 20, 1957, affirmed January 29, 1958

# STATE OF OREGON *v.* NUNN

321 P. 2d 356

*A. E. Piazza* and *Sam B. Harbison*, Medford, argued the cause and filed briefs for appellant.

*A. Allen Franzke*, Deputy District Attorney, Medford, argued the cause for respondent. With him on the brief were Thomas J. Reeder, District Attorney, and John C. Anicker, Jr., Deputy District Attorney, Medford.

Before PERRY, Chief Justice, and ROSSMAN, LUSK, BRAND, WARNER and KESTER, Justices.

KESTER, J.

This is an appeal by defendant from a conviction of first degree murder and judgment of death. Since the jury did not recommend life imprisonment, the sentence of death was mandatory (ORS 163.010).

The charging part of the indictment is as follows:

"The said Billy Junior Nunn on the 19th day of April, 1956, in the said County of Jackson and State of Oregon, then and there being, did then and there unlawfully, wilfully, feloniously, purposely, and of deliberate and premeditated malice, choke and strangle Alvin William Eacret with his hands and with a narrow belt, and did then and there kill the said Alvin William Eacret by such said choking and strangling, * * *."

No question is raised as to the sufficiency of the evidence to sustain the conviction, and no useful purpose would be served by detailing the revolting facts surrounding the homicide. It is sufficient to say that the evidence amply supported the state's theory that the defendant committed sodomy upon the decedent (a 14-year-old boy), and then killed him to prevent his telling of it. Apparently defendant choked the boy with his hands and then used the boy's own belt to strangle him.

The principal question on appeal relates to the admission in evidence of an oral confession given by

the defendant to two police officers. Defendant was arrested in Alturas, California, on May 2, 1956, and after questioning in the local jail by members of the Oregon State Police and of the Jackson county sheriff's office, he made a written confession. The next day defendant was returned to Medford, Oregon, in an automobile by two of the officers who had participated in the questioning. During the course of the trip, in conversation with the officers, defendant again confessed the crime and discussed it in some detail. He also took the officers to the scene of the crime, and he showed them where, after the killing, he had disposed of articles of personal property belonging to the Eacret boy.

The trial court excluded the written confession, on the ground that it was procured by inducement. In stating his ruling, the trial judge said:

> "I think upon the whole record the defendant was led to believe that he might get off with a plea of second degree murder."

However, the police officers were permitted, over defendant's objection, to relate the oral confession made during the course of the automobile trip. Defendant did not take the stand, so the officers' testimony was not denied.

The state and the defendant are agreed upon the principle, established in Oregon since 1881, that when a prior confession is obtained by improper inducement, a presumption arises that any subsequent confession is also the product of such inducement, and the second confession is not admissible unless the presumption is overcome by an affirmative showing that before the second confession was made the hopes or fears which induced the former one had been dispelled. *State v. Wintzingerode*, 9 Or 153, 164.

This is the general rule. 20 Am Jur 424, Evidence § 487; 22 CJS 1461, Criminal Law § 835; 3 Wigmore on Evidence (3d ed) § 855. Compare *Lyons v. Oklahoma,* 322 US 596, 88 L ed 1481, 64 S Ct 1208.

The parties are also agreed, and we find no evidence to the contrary, that nothing transpired between the first and second confessions (except the passage of time) which would change the effect of any inducements that may have existed with respect to the first one. Therefore, if the first confession was in fact obtained by inducement, it follows that error was committed in admitting the second one.

The state contends, however, that no such inducement existed as to the first confession, and that it too should have been admitted. No other ground is offered to sustain the second confession. Therefore, although the question before us relates to the second confession, in order to determine that question we are required to determine whether the trial court was right in excluding the first confession. The question is presented in a novel setting, because ordinarily the state is not in a position to claim error because of the exclusion of a confession. It can do so here only because it relies upon the alleged error in excluding the first confession as justification for admitting the second.

■ This court has had occasion many times to discuss the rules of law relating to confessions. It is settled that a confession (as distinguished from an admission, *State v. Howard,* 102 Or 431, 452, 203 P 311) is prima facie involuntary, and before it can be admitted the state has the burden of showing that it was voluntarily made, without the inducement of either fear or hope. E.g., *State v. Linn,* 179 Or 499, 507, 173 P2d 305; *State v. Henderson,* 182 Or 147, 172, 184 P2d

392, 186 P2d 519; *State v. Nagel,* 185 Or 486, 518, 202 P2d 640, cert. den. 338 US 818.

■ A confession is not inadmissible merely because the defendant is in custody (*State v. Folkes,* 174 Or 568, 580, 150 P2d 17, cert. den. 323 US 779), nor uninformed of his rights (*State v. Henderson,* supra, 182 Or at 173, 184 P2d 392), nor unrepresented by counsel (*State v. Layton,* 174 Or 217, 231, 148 P2d 522, cert. den. 323 US 728), nor because he was not taken promptly before a magistrate (*State v. Leland,* 190 Or 598, 627, 227 P2d 785, affirmed 343 US 790, 96 L ed 1302, 72 S Ct 1002, reh. den. 344 US 848), nor because the confession is made in answer to questions which are accusatory or which assume defendant's guilt (*State v. Blodgett,* 50 Or 329, 335, 92 P 820; *State v. Howard,* supra, 102 Or at 452; *State v. Henderson,* supra, 182 Or at 173). It has even been said that a confession may be admitted which is procured by trick or artifice, so long as the deception is not of such a character as is likely to produce a false acknowledgment of guilt because of hope or fear (See *State v. Green,* 128 Or 49, 60, 273 P 381).

■ The test, so far as one can be formulated, is: "Was the inducement held out to the accused such as that there is any fair risk of a false confession, for the object of the rule is not to exclude a confession of the truth but to avoid the possibility of a confession of guilt from one who is in fact innocent." *State v. Green,* supra, 128 Or at 62; *State v. Folkes,* supra, 174 Or at 580; *State v. Linn,* supra, 179 Or at 507.

In approaching this subject, we are faced with the preliminary question: What effect, if any, shall we give to the trial court's ruling excluding the first confession? The state contends that we should disregard it entirely and examine the record de novo, determining

the question of inducement, vel non, as if we were sitting in place of the trial judge. The defendant, on the other hand, contends that the trial court's exclusionary ruling imports a finding of fact that the first confession was not voluntary, and that such finding should be sustained if there is any substantial evidence to support it. Of course the ruling admitting the second confession imports a contrary finding that it was voluntary. The parties' present agreement, to the effect that both confessions should stand or fall together, puts the trial court in the position of having made inconsistent rulings.

■ Since the able analysis by Mr. Justice HARRIS in his concurring opinion in *State v. Morris*, 83 Or 429, 450, 163 P 567, it has been settled that the province of the trial judge is not to determine finally whether the confession was voluntary or not, but merely whether a prima facie showing has been made to warrant a finding that it was voluntary, in order to become admissible. Then, if it is admitted, the ultimate question of voluntariness is submitted to the jury as a part of their determination of the weight to be given to it. *State v. Rathie*, 101 Or 339, 350, 199 P 169; *State v. Green*, supra, 128 Or at 51; *State v. Bouse*, 199 Or 676, 701, 264 P2d 800.

■ When a confession has been admitted, and the trial court's preliminary finding of voluntariness is based upon conflicting evidence, it will not be disturbed on appeal unless there is clear and manifest error. *State v. Rogoway*, 45 Or 601, 607, 78 P 987, 81 P 234; *State v. Layton*, supra, 174 Or at 230; *State v. Linn*, supra, 179 Or at 508; *State v. Henderson*, supra, 182 Or at 168; *State v. Nagel*, supra, 185 Or at 519.

But where the evidence is undisputed, the matter of voluntariness is reviewable as a legal matter, since

the question arises on the legal sufficiency of the evidence. *State v. Garrison,* 59 Or 440, 445, 117 P 657; *State v. Green,* supra, 128 Or at 51; *State v. Linn,* supra, 179 Or at 508.

■ In the present case the evidence of the circumstances surrounding the confessions is not disputed, and we may consider its legal sufficiency without regard to the findings of the trial court. The evidence consists of the uncontradicted testimony of the officers and also tape recordings of the interrogation at Alturas which preceded the written confession. While the trial court had the advantage of observing the demeanor of the officers while testifying, no such factor exists as to the tape recordings.

■ It appears that, unknown to the defendant, a concealed tape recorder was operated so as to record portions of the questioning, and two reels of tape were obtained. The state did not offer the tapes in evidence initially, but made them available at the trial on defendant's request. When the state made its offer of proof with respect to the voluntariness of the written confession, the tapes were played, and the trial court listened to them, although they were still not offered in evidence. Subsequently, after the state had rested, the defendant offered in evidence and played to the jury a part of one of the reels of tape, covering a portion of the interrogation. For convenience the part of the tape that was offered was cut off and wound on a separate reel. In rebuttal, the state offered the balance of the recordings, but the offer was rejected. All the tapes have been brought to this court, and we have listened to them, pursuant to stipulation of counsel. [1]

---

[1] While our rules at the present time make no provision with respect to such matters, we urge upon the bar that when it is desired that this court consider such recordings, they should either be read into the record, or they should be transcribed and the transcript brought before us together with the actual recordings. See for example Leyra v. Denno, 347 US 556, 560, 74 S Ct 716, 98 L ed 948.

The offer of proof was made in the court's chambers, out of the presence of the jury, and in addition to playing the tape recordings, the state presented the testimony of the officers as to what transpired during the interrogation of the defendant. Later, after the written confession was excluded the officers testified before the jury and repeated the substance of their former testimony with respect to the interrogation, up to the point of the written confession. The officers testified that defendant was never threatened or promised anything. They then related the oral confession that was made on the trip the following day. The question of whether the oral confession was voluntary was submitted to the jury, and no exception was taken to the court's instructions on that subject.

The interrogation at Alturas was in three sessions, lasting from 7:52 to 8:50 a.m., then from 9 to 10:50 a.m., and finally from 5:36 to 6:30 p.m., covering a total period of approximately four hours, all on May 3, 1956. No claim is made that defendant was mistreated or that he was denied any physical comforts or conveniences. At the conclusion of the final session defendant asked for paper and pencil, proceeded to write out the confession in longhand, and signed it, finishing at 8:10 p.m. According to the officers' testimony, before he wrote the confession defendant was told that his statement would have to be voluntary, and that it could be used against him.

During the oral interrogation, up to the time he wrote out the confession, defendant did not admit the crime. At first he stoutly denied it, and when shown a photograph of the boy he denied that he had ever seen him. The nearest thing to an admission came when the officers advised him that he had been seen with the boy at a time and place near that of the crime.

To this, defendant remarked: "No matter what I say, you've got it wrapped up anyway." Thereafter the tone of his remarks appeared to change from outright denial to a hypothetical basis—"Supposing I did it—, etc."

■ In the course of the questioning defendant asked to see a lawyer. After one of the recesses the officers advised him (falsely, it is now admitted) that they had consulted with a couple of lawyers about it, but they were not interested in his case. However, they did arrange for the district attorney for Modoc county, California, to interview him during the day, and that interview was also recorded. Defendant claims that he was misled as to the capacity in which the district attorney was acting, but it is clear that defendant knew that the district attorney was not purporting to act as his own attorney. In any event, nothing of significance occurred during that portion of the conversations. The district attorney did say that "* * * if you have it on your mind * * * you ought to get it off your mind * * *;" but under our decisions such a statement does not vitiate a confession. *State v. Humphrey*, 63 Or 540, 552, 128 P 824.

■ The claimed inducements on which defendant relies are: (1) that he was led to beleive he would be charged only with second degree murder; and (2) that he was promised psychiatric help at public expense.

With respect to the degree of the offense, it is clear that defendant did discuss with the officers, although on a hypothetical basis, whether certain facts would constitute first or second degree murder. When the subject of penalty came up, the officers undertook to explain, in laymen's language, the element of premeditation. They advised him, in substance, that if he had planned the killing in advance, then he was

guilty of first degree murder, and as they put it, he would "snuff gas." On the other hand, they explained, if the killing was on the spur of the moment, then it would be only second degree, and he would get life imprisonment with the possibility of parole after seven and one-half years. It does not appear that he was advised of the possibility of life imprisonment, even on a first degree conviction, if the jury so recommended.

After a recess, one of the officers stated to the defendant that he had telephoned the district attorney for Jackson county and discussed with him the question of whether the offense was first or second degree murder. A portion of the conversation, as we hear it on the tape recording, was as follows:

First officer (apparently deputy Joseph Walsh): "The conversation was this. He says from what you have told me, from what we've talked about on the telephone, he said that he doesn't think that we have a first degree murder case. That he feels on the basis of the information that we gave him that it's a second degree murder case, and that the feeling, your feeling, Bill, about—I told him how we felt that there's been lots of time since you had an examination, observation, psychiatric treatment. He said that you can tell him for me that he can have any psychiatrist that he chooses at all—anyone at all—with no objection from him, and that if you're without funds he will provide a—one of the best in the state, and that—."

Second officer (apparently Sergeant Tichenor): "Is that what he said?"

Walsh: "He said that he would provide a psychiatrist that would talk to you and counsel you, provided that you talk to the psychiatrist with—of course it's confidential—you understand—just the two of you—you talk to him and you don't hold nothing back, not a thing, because without a complete report the district attorney's office of course

would have no way of altering any views that they might have. * * * (indistinct)."

Tichenor: "Would he provide the funds?"

Walsh: "That's right. That would come out of the district attorney's office at Medford."

Nunn: "Well why did he say that it'd be second degree?"

Walsh: "Perhaps the reasoning was—he didn't say anything about it—the fact that it was—it was actually—it was an incidental to the other, and—accidental. His opinion, his conclusions as of now are that it was spontaneous."

Tichenor: "You mean that premeditation was lacking?"

Walsh: "Was lacking."

At another point, one of the officers (apparently Sergeant Tichenor) expressed his own view that the circumstances indicated second degree rather than first. He said:

"If I thought for a minute that you had it planned all along to go out here and have a sodomous act with an individual with the intention of killing him, I wouldn't be wasting my time talking to you, right now."

and again:

"We wouldn't be sitting around here this afternoon discussing this situation and calling the district attorney—Joe called his district attorney over there—to get this thing ironed out, if we felt for one damn minute that you planned this thing under a long range program—I just—we wouldn't even bother with you. We'd have taken you back and thrown you in the clink, and that's the way it would have ended. * * * If I didn't feel that way I wouldn't be talking to you."

and again:

> "Now there is only one thing that we're going to have to find out. And if you did what I told you in the first place—planned this thing on a long range program—I don't want you to tell us one damn thing, because I don't even want to talk to you about it. If this other situation is involved, like I told you, then we want to hear your story. Otherwise, no."

Up to that time, defendant had not made any incriminating admissions, so the opinions of the officers and of the district attorney, as relayed by the officers, were necessarily based upon the results of their own investigations. According to the officers' testimony defendant was told that the degree of the offense would be determined by a review of all the facts, including any statement he might make.

The portion of the interrogation immediately prior to defendant's writing the confession is not recorded on the tapes. It was described in Sergeant Eaton's testimony as follows:

> "Q Yes; how did they explain the difference?
> "A They told him first degree murder was a premeditated act; that anyone killing another person with premeditation was first degree murder, and that second degree murder was anything less than that, where there was no premeditation involved.
>
> "Q Was it shortly after that he asked for writing material and indicated he would give a statement?
> "A Yes; yes, it was. He was told at that particular time that we didn't know whether it was first or second degree, but the only way the district attorney or prosecutor could determine whether or not it was first or second degree murder was a statement from him, advising how it happened.

"Q Now, as I understand it from your testimony, he wrote this himself?

"A He wrote it himself; yes, sir.

"Q No one of the officers wrote it, or no shorthand reporter wrote it?

"A No, sir.

"Q Is that specifically the way he indicated he wanted to do it?

"A Yes. He was told by deputy Walsh that we could get someone to take his statement in shorthand and then transcribe it; or, he was told we could type it for him, or that he could write it himself; or we told him he could have his statement tape-recorded. He expressed his wish that he wanted to write it out himself.

"Q Was pencil and paper furnished him?

"A Yes; pencil and paper were both provided for him.

"Q When did he start writing the statement?

"A Just shortly after 6:30.

"Q When did he finish?

"A At 8:10 p.m. that same evening.

"Q Was there any conversation with him at all while he was writing the statement?

"A Not while he was writing the statement, no.

"Q Were the three of you there while he was writing the statement?

"A Just as he started to write the statement he—Mr. Nunn indicated his desire for a cup of coffee, and there was none available there in the courthouse, so deputy Walsh and I went to a restaurant across the street and got a container of coffee. We were gone ten minutes, and when we returned he had started to write his statement.

"Q Did Sergeant Tichenor stay there with him while you went for the coffee?

"A Yes.

"Q After he wrote the statement, was there any conversation?

"A After Mr. Nunn finished writing the statement, he handed it to Sergeant Tichenor, who read it, and then deputy Walsh read it, then myself, and he asked if that sounded like second degree or first degree murder, and he was told that we couldn't tell definitely; that it would be up to you to determine whether it was or not; that we couldn't tell him whether it was or not."

Assuming, as we must, the truth of this testimony, defendant's concern over whether his written confession showed first or second degree murder (while wholly natural under the circumstances) indicates that up to that point the question was still open, and that no promise had been made.

With respect to the offer of psychiatric help, it is clear, both from the recordings and from the officers' testimony on the stand, that defendant was promised the services of a psychiatrist, and that if he had no funds the county would pay the bill. As will be mentioned later in connection with another point, defendant did have a psychiatric examination prior to trial by a doctor appointed by the court and paid for by the county.

However, the discussion related not merely to psychiatric examination prior to trial, but also to treatment and possible rehabilitation. In describing it, Sergeant Eaton testified:

"A The defendant was interested in psychiatric treatment, and deputy Walsh advised him he had talked to the district attorney by telephone, and told him that—Or, the district attorney had told deputy Walsh that if the defendant wanted psychiatric treatment or psychiatric examination, that if necessary he, himself, meaning the district at-

torney, would provide that, if necessary out of his budget."

The idea of psychiatric treatment was, of course, inconsistent with capital punishment. To that extent the discussion about treatment tended to reinforce the expressed opinions of the officers and of the district attorney that the offense was only second degree. In the light of the rest of the discussion, the mention of psychiatric treatment must have been interpreted as relating to the contingency that the penalty turned out to be imprisonment rather than death. As previously stated, we think that question was left open.

The portion of the discussion (quoted above from the recording) wherein defendant was told that he should not hold anything back from the psychiatrist, as without a complete report the district attorney would have no basis for altering his views, is difficult to understand. It appears to refer, not to the district attorney's views on the degree of the offense (which are represented as being that the offense was only second degree), but rather to his views on the possibility of parole and rehabilitation, which had previously been discussed. In any event, the condition of full disclosure related to the time when the psychiatric examination would be made, and it was expressly stated that such interview would be confidential. We find nothing which appears to make the right to a psychiatrist depend upon the defendant's giving a confession to the officers.

While portions of the tape recordings are extremely difficult to hear, the passages quoted in this opinion seem to us to be the ones of most significance. Viewing the interrogation in its entirety, we can find no promise of benefit conditioned upon defendant's making a confession to the officers. The most that

could be said is that defendant may have been led to believe that the offense was only second degree, that he would have a psychiatric examination prior to trial, and that upon conviction and sentence of imprisonment he would have psychiatric treatment. But these were held out as things to which he would be entitled in any event, and they were not dependent upon his making a confession.

Even if defendant—influenced perhaps by wishful thinking and the hope that springs eternal in the human breast—assumed that he would get more lenient treatment by making a confession, that would not, as a matter of law, make the confession inadmissible. It is not every inducement that vitiates a confession, but only such an inducement as involves "any fair risk of a false confession." (*State v. Green; State v. Folkes; State v. Linn,* all supra). If the defendant was motivated by a desire to tell the truth, it does not matter that his desire was buttressed by the hope that telling the truth would also bring leniency.

Under all the circumstances, we think that the state satisfied the burden of making a prima facie showing that the written confession was voluntary; that it should have been admitted in evidence; and that the jury should have passed upon the ultimate question of whether or not it was in fact voluntary. Since that was true of the written confession, it was at least equally true of the oral confession which was admitted, and no error was committed in receiving the oral confession in evidence.

Defendant claims that the indictment does not charge first degree murder, and he assigns as error the trial court's overruling of his motion to dismiss the indictment and of his motion to withdraw first

degree murder from the jury's consideration. To repeat, the indictment charged:

> "The said Billy Junior Nunn on the 19th day of April, 1956, in the said county of Jackson and State of Oregon, then and there being, did then and there unlawfully, wilfully, feloniously, purposely, and of deliberate and premeditated malice, choke and strangle Alvin William Eacret with his hands and with a narrow belt, and did then and there kill the said Alvin William Eacret by such said choking and strangling, * * *."

Defendant's point is that while the choking and strangling are alleged to be premeditated, it is not expressly charged that the killing by such choking and strangling was premeditated. He relies on *State v. Andrews*, 84 Iowa 88, 50 NW 549, and *State v. Linhoff*, 121 Iowa 632, 97 NW 77, which hold that an indictment which accuses the defendant of having inflicted the wound which caused death feloniously and with premeditated malice, but does not charge that the killing was so committed, does not charge murder in the first degree.

Oregon Constitution, Art 1, § 11, provides that "In all criminal prosecutions the accused shall have the right * * * to demand the nature and cause of the accusation against him * * *." ORS 132.520(2) provides that the indictment shall contain:

> "* * * * *
>
> "(2) A statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

ORS 132.540 provides that the indictment is sufficient if it can be understood therefrom that:

> "* * * * *
>
> "(f) The act or omission charged as the crime

is clearly and distinctly set forth in ordinary and concise language, without repetition, in such a manner as to enable a person of common understanding to know what is intended and with such a degree of certainty as to enable the court to pronounce judgment, upon a conviction, according to the right of the case."

Under the Oregon statutes, which were adopted for the territory of Alaska, an indictment for first degree murder was upheld which alleged that the defendants, with deliberate and premeditated malice, shot the decedent and inflicted a mortal wound, of which he died instantly, even though it did not allege that they, with deliberate and premeditated malice, intended to kill him. *Fitzpatrick v. U.S.*, 178 US 304, 44 L ed 1078, 20 S Ct 944.

See also *St. Clair v. U.S.*, 154 US 134, 38 L ed 936, 14 S Ct 1002, holding that the use of the conjunction "and" makes the words importing intent apply to the result as well as to the act.

■ To the argument that in both of the above cases the word "mortal" was in the indictment, it may be answered that the word "strangle" in the present indictment denotes death caused by choking (Webster's New International Dictionary).

While the indictment here is somewhat inartfully drawn, we have no doubt that it adequately apprised defendant of the nature of the charge against him, it was sufficient to enable the court to pronounce judgment, and it would protect defendant against double jeopardy. To the extent that the Iowa cases are contrary, we decline to follow them. There was no error in overruling the motions.

■ Defendant assigns error based upon the admission of certain photographs, on the ground that they

were unduly gruesome. The photographs are two enlarged black and white pictures of the victim's body at the scene, and four color slides of the victim taken shortly before and during the autopsy. The slides were projected on a screen for viewing by the jury.

While the pictures are admittedly unpleasant, the nature of the crime was such that it could hardly have been portrayed in a delicate or esthetic fashion. They were relevant to the issues and were properly admitted. *State v. Nelson*, 162 Or 430, 452, 92 P2d 182; *State v. Henderson*, supra, 182 Or at 182 et seq.; *State v. Long*, 195 Or 81, 125, 244 P2d 1033.

■ Error is assigned in respect to instructions given and refused on the subject of second degree murder. The trial court instructed, in the language of the statute, on first degree murder (ORS 163.010(1)), second degree murder (ORS 163.020(1) and (2)), and manslaughter (ORS 163.040(1) and (2)). He adequately explained such terms as "deliberation," "premeditation," "malice," and the like.

Defendant's complaint is that, while the court explained the felony-murder part of the second degree statute, by relating it to the crime of sodomy, he did not elaborate upon the portion of the second degree statute which concerns a killing which is purposeful and malicious but not deliberate and premeditated. Considering the charge as an entirety, we believe the subject was fully covered. In passing, we note that the requested instructions have not been brought before us except by means of appellant's brief, but because of the seriousness of the penalty involved we have considered them as if the record were complete.

■ Defendant's final assignment of error is based upon the trial court's denial of his motion for a continuance. The request for continuance was made by

written motion, supported by affidavits, which was filed and denied prior to trial, and by oral motion made at the commencement of trial.

Ordinarily, for such matters to be reviewable, they should be made a part of a bill of exceptions. *State v. Reyes*, 209 Or 595, 598, 303 P2d 519, 304 P2d 446, 308 P2d 182.

■ The present case, however, is an automatic appeal under Oregon Laws 1955, ch 662 (ORS 138.810 et seq.). It is the first of this kind to come before us. The act just cited provides that the clerk of the court in which the judgment was rendered shall:

"* * * within 90 days after the filing of the judgment, transmit the transcript of testimony, depositions, exhibits and other papers containing the evidence heard or offered to the clerk of the Supreme Court."

Appellant apparently assumed that the effect of this statute is to eliminate, in cases in which there is an automatic appeal, the usual requirement of a bill of exceptions. (Cf. ORS 136.330 and 19.100).

There is no bill of exceptions in this case, but the clerk below has sent to us the transcript of testimony (certified by the court reporter and the county clerk, but not by the trial judge), the exhibits, and the entire pleading file including the motion for continuance and its supporting and opposing affidavits. The proceedings on the oral motion for continuance are included in the transcript of testimony. Because of the seriousness of the case, and the fact that the new statute leaves the matter at least uncertain, we will treat this as an adequate record in this case. From it, we find the following chronology.

May 5, 1956, information filed.

May 7, 1956, preliminary hearing held, defendant bound over to grand jury.

May 11, 1956, indictment returned.

May 15, 1956, defendant arraigned and allowed until May 31, 1956, to plead.

May 31, 1956, plea of not guilty entered and trial set for July 17, 1956.

June 28, 1956, defendant moved for appointment of psychiatrist to examine defendant at county expense.

July 6, 1956, order entered for examination by psychiatrist and examination made.

July 13, 1956, defendant moved for continuance on ground that psychiatrist's report had not been received and would not be received until July 14, and that the time remaining would be inadequate to prepare for trial.

July 14, 1956, psychiatrist's report received by defendant's attorney.

July 16, 1956, district attorney filed affidavit in opposition to continuance, showing that the state had arranged for 18 witnesses to attend the trial on July 17, some of whom were from out of the state.

July 16, 1956, hearing on motion for continuance; motion denied.

July 17, 1956, trial commenced; motion renewed and again denied.

■ Defendant's motion for continuance was based upon the ground that he had inadequate time for preparation after receiving the psychiatrist's report. He excuses the delay in requesting the examination on the ground that between May 11 and June 27 he was attempting to secure funds for employment of a psychiatrist. However, the trial court could well have found that the lack of funds could have been determined earlier, especially since defendant's attorneys

were serving by appointment of the court, because of defendant's lack of funds, and thereby had notice of defendant's financial condition. It does not appear when defendant's present attorneys were appointed by the trial court, but they represented defendant at least by the time of the arraignment on May 15.

Furthermore, the trial court could have found that the time in which to study the report was not unduly short. Apparently the report was not favorable to the defendant, as he did not raise the defense of insanity (although the trial court gave him an opportunity to do so) and the psychiatrist did not testify. The only purpose of additional time would have been to have further examinations. The trial court offered to order an additional examination if defendant wished to plead insanity, but defendant did not avail himself of that opportunity.

Under the circumstances we cannot say that the trial court abused his discretion in denying the continuance. *State v. Nelson*, supra, 162 Or at 444.

■ This disposes of all the assignments of error, and the judgment must be affirmed. Under the automatic appeal statute (ORS 138.810 et seq.), this court appointed present counsel, who had been appointed to represent defendant in the trial court, to handle the appeal. Heretofore, upon a showing that defendant was without funds, this court ordered that the county pay the expense of preparing the transcript of testimony and of printing the appellant's brief. No further showing has been made, but because of defendant's confinement we assume that he is still without funds; and his attorneys are therefore entitled to a reasonable fee, to be allowed by this court and paid by the county in which the judgment of death was entered. (ORS 138.840).

At the time of argument counsel advised us that they had expended a total of 100 hours on this case, and they requested a fee of $1,500. The State Bar advisory schedule of minimum fees presently provides for a fee of $400 for the appellant, plus $150 for argument. The nature of this case is such that the attorneys are certainly entitled to more than the minimum. The questions have not been free from difficulty, and counsel have performed their task well. We express our gratitude to them for having discharged a high responsibility to the administration of justice.

We are of the opinion that a reasonable fee in this case is $1,000, and we order that such amount be paid by Jackson county. The judgment is affirmed.