Argued August 21, affirmed November 5, petition for
rehearing denied November 29, 1973

BILLY JUNIOR NUNN (No. 73759), *Appellant,*
*v.* CUPP, *Respondent.*

515 P2d 421

*Robert C. Cannon*, Deputy Public Defender, Salem, argued the cause for appellant. With him on the briefs was Gary D. Babcock, Public Defender, Salem.

*William R. Canessa*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before LANGTRY, Presiding Judge, and FOLEY and THORNTON, Judges.

FOLEY, J.

Petitioner, convicted of first degree murder in 1956, sought to have his 1956 confession declared involuntary by the post-conviction court. That court found his confession voluntary "beyond a reasonable doubt" and denied him any relief. He appeals.

■ Petitioner was convicted by jury of first degree murder and sentenced to death in 1956 in Jackson County. His conviction was affirmed in *State v. Nunn,* 212 Or 546, 321 P2d 356 (1958).[①] In that case the trial court had excluded the written confession on the ground it was procured by inducement. There the trial court had said:

"'I think upon the whole record the defendant was led to believe that he might get off with a plea of second degree murder.'" 212 Or at 551.

The Supreme Court reversed, saying:

"* * * [W]e think the state satisfied the burden of making a prima facie showing that the written confession was voluntary * * *." 212 Or at 564.

Thereafter, petitioner instituted a post-conviction proceeding asking that his conviction be vacated because the voluntariness of his confession had been determined by an improper standard and, in fact, his confession was involuntary. In *Nunn v. Cupp,* 10 Or App 528, 500 P2d 1237 (1972), this court found that an improper

---

[①] Petitioner's death sentence was commuted to life imprisonment. *See* Eacret et ux v. Holmes, 215 Or 121, 333 P2d 741 (1958).

standard had been used in determining voluntariness of petitioner's confession and remanded the case to the post-conviction court for a hearing on voluntariness, at which the proper standard was to be applied. As aforesaid, the post-conviction court found petitioner's confession voluntary "beyond a reasonable doubt." The scope of review by this court of the post-conviction court's findings is a determination of whether the evidence sustains this historical, factual finding and whether the historical facts as found are sufficient to sustain a finding of voluntariness under the state and federal constitutions. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

In *State v. Shipley,* 232 Or 354, 362, 375 P2d 237 (1962), the Supreme Court held:

"The only permissible test for determining the admissibility of a pretrial confession is whether it was freely and voluntarily made. As said by the Supreme Court in *Culombe v. Connecticut,* [367 US 568, 81 S Ct 1860, 6 L Ed 2d 1037 (1961)] at 602:

" 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'

Voluntariness is the test which has been consistently applied in this state. [Citing cases.]"

Recently, in the case of *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973), the court reaffirmed the test for voluntariness set forth in *Culombe.*

■ In determining whether a person's will has been overborne in a particular case, the totality of all the surrounding circumstances, including the characteristics of the accused and the details of the interrogation, must be assessed, *Schneckloth v. Bustamonte,* supra; *Greenwald v. Wisconsin,* 390 US 519, 88 S Ct 1152, 20 L Ed 2d 77 (1968); *Clewis v. Texas,* 386 US 707, 87 S Ct 1338, 18 L Ed 2d 423 (1967); *Haynes v. Washington,* 373 US 503, 83 S Ct 1336, 10 L Ed 2d 513 (1963); *Frye v. Gladden,* 1 Or App 629, 465 P2d 716 (1970). For these purposes we review the circumstances.

On April 29, 1956, the body of Alvin Eacret, a 14-year-old boy from Klamath Falls, Oregon, was found lying in a small clearing in Tub Springs State Park in Jackson County, Oregon. On May 1 the police issued an all-points bulletin requesting that petitioner be detained for questioning in regard to the murder. The following day the petitioner was arrested in Alturas, California. He was taken to the county jail where he waived extradition proceedings. No charges were filed against him. The Oregon authorities were notified of petitioner's arrest and two state police officers and a deputy sheriff arrived in Alturas on the morning of May 3.

Petitioner was questioned in the trusties' quarters of the county jail. These quarters consisted of several rooms and were furnished with bed, table and chairs. The room used for questioning was approximately 8 feet by 10 feet in dimension and was equipped with regular light fixtures. The windows in these rooms had no bars. Both breakfast and lunch were made available to petitioner but he did not eat.

The questioning was in three sessions, lasting from 7:52 to 8:50 a.m. and then from 9 to 10:50 a.m.

and, finally, from 5:36 to 6:30 p.m., covering a total of approximately four hours, all on the day of May 3, 1956.

In the morning sessions officers questioned petitioner about his personal history, that is, employment, family status, educational background, residence and what he was doing on the day the victim disappeared. He was also asked whether he knew the Eacret boy. He was shown a photograph of the boy and he denied that he had ever seen him. He told the officers that he knew he would be picked up for this crime. Near the end of the morning session officers advised the petitioner that he had been seen with the boy at the time and place near that of the crime. To this petitioner remarked, "It looks like you've got it wrapped up." During the morning sessions there was some discussion about the penalties for the crime of murder and the availability of psychiatric examinations for petitioner.

During the morning sessions petitioner requested counsel and stated that he did not wish to make any further statements but continued to answer and converse with the officers. He was advised of his right to counsel and, in fact, knew about his right to counsel. He was told that "we didn't have the facilities to provide him with an attorney there * * *," but "* * * we would ask the local district attorney to talk to him and advise him of such rights as he had * * *." Petitioner was advised of the capacity of the district attorney. Petitioner then said he wanted to and did talk to the district attorney.[②]

[②] The Supreme Court in State v. Nunn, supra, said the following in connection with the interview with the district attorney:

"* * * [T]hey did arrange for the district attorney for Modoc county, California, to interview him during the day,

In the afternoon session petitioner asked the officers about the difference between first and second degree murder. At this time petitioner's questions related more to the possible penalties involved than the crime itself. He was told the degree of murder would depend upon a review of all the facts. He discussed with the officers, on a hypothetical basis, whether certain facts constituted first or second degree murder. The officers undertook to explain in layman's language the meaning of premeditation. They advised him, in substance, that if he planned the killing in advance, he was guilty of first degree murder. If, on the other hand, the killing were on the spur-of-the-moment, then it would only be second degree murder and he would get life imprisonment with a possibility of parole. The officers informed petitioner that it looked like second degree murder to them and to the district attorney on the basis of the information they had, but without all the facts they did not know whether it was first or second degree murder. At no time was any indication given to the petitioner of the nature of the charge which would ultimately be placed against him. He was informed that he would be entitled to a psychiatric examination and if he wanted such an examination or treatment, that the district attorney would provide it. The availability of a psychiatric examination was not held out as a condition for his giving a statement.

---

and that interview was also recorded. Defendant claims that he was misled as to the capacity in which the district attorney was acting, but it is clear that defendant knew that the district attorney was not purporting to act as his own attorney. In any event, nothing of significance occurred during that portion of the conversations. The district attorney did say that "* * * if you have it on your mind * * * you ought to get it off your mind * * *. * * *." 212 Or at 557.

During the oral questioning petitioner made no admission of the crime. There was no abuse of petitioner and no threats of violence or promises made to petitioner. At the end of the afternoon session petitioner asked for pencil and paper and agreed to make a statement. He was advised that any statement he made could be used against him and that his statement must be voluntary, although the testimony of one officer conflicts with this. While petitioner was writing his statement he stopped and showed it to Officer Tichenor and asked whether it appeared that he had planned the crime. The officer replied that he could not tell until the statement was complete. The officer did not read the statement at that time. After petitioner completed his statement he again asked the officers whether it appeared to be first degree or second degree murder and was told that they couldn't tell definitely; that it would be up to the district attorney to determine what charge should be brought.

Petitioner was lodged at the Alturas jail overnight and the next day, May 4, he was transported back to Oregon. During this trip petitioner made additional incriminating oral statements.

Examining now the subjective characteristics of the petitioner and the facts surrounding the interrogation itself, we note that petitioner was a mature adult. He had had previous dealings with the police and had been previously convicted of sodomy. During the interrogation he was alert and aware. He was conscious of his predicament and also that the authorities wanted a statement. He knew that he faced a possible death sentence. He had concluded not to admit the crime until something positive happened, even though his guilt was a great burden to carry. He initiated the discussion

of the differences between first and second degree murder. He was aware of his right to counsel. Though the officers cautioned him that they could not guarantee that he would be charged with second degree murder, he nonetheless made the decision to confess hoping that it was second degree murder and having been advised that his statement could be used against him. From these facts we think petitioner had a capacity to make a rational and independent decision.

The interrogations themselves present no evidence of being "inherently coercive." Petitioner was questioned in the trusties' quarters of the county jail. There was nothing overbearing about this place. He was given the opportunity to eat, drink and rest. The actual time of interrogation was not protracted; it lasted less than four hours and was interspersed with breaks, one of which was for over five hours. The length of time between arrest and petitioner's confession was not over-long. He was arrested sometime the day before he confessed, but was not questioned about the crime until the next day. There was no physical abuse or threat of violence nor were promises made to him.

■ Petitioner was not afforded counsel on request, nor was the interrogation ceased when petitioner indicated he did not want to answer any more questions. Though these facts are relevant to the issue of voluntariness, they are not by themselves controlling in pre-*Miranda*® confessions. They must be viewed in the light of the "totality of the circumstances." *Frazier v. Cupp*, 394 US 731, 89 S Ct 1420, 22 L Ed 2d 684 (1969). In *Frazier*, Frazier had been informed of his

---

® *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

right to counsel and that anything that he said could be used against him. He indicated during the course of the interrogation: "I think I had better get a lawyer before I talk any more. * * *" 394 US at 738. He was not given an attorney nor was the questioning ceased upon his request. Frazier confessed and the court found his confession voluntary. The court pointed out that even though Frazier had asked for counsel and for the questioning to stop, he continued to answer questions and that it was possible since Frazier did not pursue the subject that the officers took his request more as a passing comment than as a request. As in *Frazier,* petitioner Nunn continued to answer questions. Thereafter, he did not renew his request during the interrogation but actively participated in the conversation. He exhibited a willingness to continue.

◼ Considering, then, the totality of the circumstances, we find there are sufficient facts in the record to support the post-conviction court's finding of voluntariness and this finding should not be disturbed on this appeal. *Ball v. Gladden,* supra.

◼ As his second assignment of error petitioner contends that the post-conviction court erred by admitting into evidence the transcript of petitioner's 1956 trial. ORS 138.630 permits the introduction of the trial transcript in a post-conviction proceeding, so the transcript was clearly admissible, as the court found.

The thrust of petitioner's objection to the 1956 transcript is that he was not allowed the opportunity to cross-examine the witnesses who testified in that trial under the new standards set for voluntariness. In fact, at the 1956 trial there was a hearing on voluntariness by way of offer of proof. In addition, the officers involved in the interrogation also testified before the

jury at length regarding the events surrounding the interrogation. At that trial petitioner did confront and cross-examine the officers on the events surrounding the interrogation which resulted in petitioner's confession. It is true, as petitioner asserts, that since his criminal trial the criteria for determining voluntariness has changed from whether the confession is likely to be truthful to whether it is voluntary in fact, but the factors which go to determine voluntariness in fact have not changed. The facts surrounding petitioner's confession have not changed. Petitioner contends that such factors as the right to counsel, failure to discontinue interrogation upon request, and failure to bring petitioner before a magistrate all bear upon the question of voluntariness. At the 1956 trial each of these areas was subject to cross-examination and the facts elicited. If the petitioner sought other facts which he wanted in evidence, he could have subpenaed the witnesses.

In his third assignment of error the petitioner contends that since the tapes of the interrogation were no longer available petitioner could not have a fair hearing on the voluntariness of his confession and therefore should be granted a new trial.

In *Nunn v. Cupp,* supra, this court remanded the case to the post-conviction court for a hearing on voluntariness. This hearing was held; the state introduced evidence; the petitioner was given the opportunity to do the same; and pursuant to ORS 138.630 petitioner was afforded the opportunity to reconstruct the contents of the tapes. He did so. Mr. Piazza and Mr. Harbison, petitioner's trial attorneys, testified to the contents of the tapes. Petitioner testified to the events surrounding the interrogation. The post-conviction

court was asked to take judicial notice of the partial transcription of the tapes found in *State v. Nunn,* supra. Petitioner contends that he was prejudiced because certain information was not transcribed by the Oregon Supreme Court in its opinion.[4] He specifically points out a statement purported to be made by the district attorney, Mr. Nunley, but he makes no showing why he did not subpena Mr. Nunley as a witness to reconstruct this evidence.

■ Petitioner contends that the correct rule of law in a situation such as this is that loss of evidence through no fault of the accused is a denial of due process where there is a good possibility that such evidence could have been used successfully for obtaining a new trial. In support he cites two cases. The first, *People v. Serrato,* 238 Cal App 2d 112, 47 Cal Rptr 543 (1965), deals with the state's failure to prepare a transcript for appeal. This was not a case of destruction of evidence. A transcript was essential for appeal and could not be reconstructed by an evidentiary hearing. The second case, *United States v. Consolidated Laundries Corporation,* 291 F2d 563 (2d Cir 1961), involved a case of "negligent suppression" of the evidence by the government. A new trial was ordered, not on constitutional grounds but rather based upon the supervisory powers of the federal court. In petitioner's case there is no claim of suppression of evidence, but rather the inadvertent loss of evidence. Petitioner claims that this loss of the tapes represents state action under the meaning of the Fourteenth Amendment. Even

---

[4] There the court said of the tapes:

"* * * [T]he passages quoted in this opinion seem to us to be the ones of most significance * * * [in connection with whether any promise of benefit had been made to defendant conditioned on his making a confession]." 212 Or at 563.

if permanent retention of evidence were statutorily required, the inadvertent loss or destruction is not state action. *Miller v. State,* 204 Kan 223, 460 P2d 501 (1969). Fortuity is not state action. *United States v. Pate,* 318 F2d 559, 562 (7th Cir 1963), presents a reasonable rationale:

"* * * Even if we concede that the absence of any part of the transcript might hamper [petitioner] in an attempt to secure a review of his conviction, it cannot be rationally contended that the Fourteenth Amendment has ever been construed as a complete insulation against the 'slings and arrows of outrageous fortune', which may strike anyone at any time and are unfortunately incidental to life itself. Counsel for [petitioner] has never challenged the good faith or the truth of [the reporter's] statement that he could not find the missing notes. There has been no suggestion of any human power which can find them. * * *

"* * * * *

"* * * [T]he inescapable facts inexorably require us to hold that the Fourteenth Amendment does not require the performance of the impossible."

Just as in *Pate* there is no evidence that the Oregon Supreme Court deliberately lost, destroyed or refused to produce the tapes. There has been no showing of deliberate state action and the post-conviction court did not err in finding that the tapes of the confession were not essential to the determination of voluntariness.

■ Petitioner's fourth assignment of error is that the post-conviction court erred in finding that petitioner was not entitled to see and examine the petitioner's written confession which was also lost. The post-conviction court did not rule that petitioner was not entitled to examine his written confession. The

court did find that the written confession was not essential to the determination of the voluntariness of petitioner's confession. While it is questionable if this issue was preserved for this appeal, we agree with this finding of the post-conviction court and that the unavailability of the confession, just as with the tapes, was not the product of deliberate state action and that petitioner was afforded an opportunity to reconstruct the evidence.

In summary, we agree with the determination of the post-conviction court.

Affirmed.