STATE OF OREGON,
*Appellant - Cross-Respondent,*

*v.*

JACK EDWARD WILLIAMS, JR.,
*Respondent - Cross-Appellant.*

(10-81-09107; CA A25109)

668 P2d 1236

Brian R. Barnes, Assistant District Attorney, Eugene, argued the cause for appellant - cross-respondent. With him on the briefs was J. Pat Horton, District Attorney, Eugene.

Thomas L. Fagan, Deputy Public Defender, Eugene, argued the cause and filed the brief for respondent - cross-appellant.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

In this criminal proceeding, the state appeals from a trial court order suppressing defendant's confession to the crime of robbery in the first degree. The state contends that the trial court erred by concluding that defendant's confession was involuntary and had been obtained through a violation of his Sixth Amendment right to counsel and the constitutional protections explained in *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981). Defendant cross-appeals, claiming that his statement was the product of an illegal arrest and should have been excluded for that reason. We hold that defendant's confession was voluntary, that *Edwards* does not apply to the facts of this case, that defendant waived his right to counsel and that the arrest was legal. Accordingly, we reverse.

On May 18, 1981, defendant was arrested in connection with a robbery. At the time of the arrest, he asserted his right to remain silent and requested an attorney. The following day, an information was filed in district court, charging defendant with first degree robbery. On May 21, an attorney was appointed to represent him. On May 22, the district attorney moved to dismiss the information against defendant, because there was insufficient evidence to proceed with a prosecution. The request was granted; defendant was not indicted.

On September 25, 1981, after more evidence had emerged implicating defendant in the robbery, he was again arrested. This time, he did not request an attorney. Instead, he and the arresting officer agreed that defendant should see Deputy Grimes, the officer who had arrested him in May.[1] Grimes appeared and advised defendant of his *Miranda* rights. Later that evening, defendant gave oral and tape recorded statements admitting his participation in the robbery.

Prior to trial, defendant moved to have the statements suppressed on the ground that they were

---

[1] The pertinent trial court finding states that:

"During this discussion between [defendant] and [the arresting officer] it was concluded that Deputy Grimes should be contacted."

At the hearing on defendant's motion to suppress, Pearson testified that defendant persistently asked him to call Grimes to the station.

"* * * illegally, improperly and/or involuntarily obtained under the following circumstances: Custodial interrogation on September 25, 1981, of the defendant based on improper inducements following [an] illegal arrest * * *."

The trial court granted the motion, and this appeal followed.

■     The state's first contention is that the trial court erred by finding that defendant's confession was involuntary. While we are bound by the trial court's findings of "historical fact"[2] if there is evidence to support them, we decide, on those facts, whether or not the confession was voluntary. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *see Krummacher v. Gierloff,* 290 Or 867, 869, 627 P2d 458 (1981); *State v. Warner,* 284 Or 147, 158, 585 P2d 681 (1978).

The trial court's pertinent findings of "historical fact" were:

"* * * * *

"32)   After Mr. Williams' arrest on September 25, 1981, he was transported by Deputy Pearson to the Veneta substation of the Lane County Sheriff in a patrol vehicle in handcuffs.

"33)   At the Sheriff's substation Mr. Williams was held in handcuffs.

"34)   Mr. Williams indicated to Deputy Pearson that he was concerned about his release since his brother was being married that weekend in Veneta and he, Mr. Williams, was to be the best man in the wedding.

"35)   Deputy Pearson indicated that he did not have authority to simply release Mr. Williams.

"36)   During this discussion between Mr. Williams and Deputy Pearson, it was concluded that Deputy Grimes should be contacted.

"37)   Deputy Pearson then called Deputy Grimes who responded to the substation and contacted Mr. Williams.

"38)   Upon contacting Mr. Williams, Deputy Grimes advised Mr. Williams of his *Miranda* rights to which Mr. Williams responded that he understood these rights.

"* * * * *

---

[2] Findings of "historical facts" are findings concerning the circumstances that surrounded a defendant's decision to make a statement.

"41) Deputy Grimes then contacted Lieutenant McManus, his supervisor, about Mr. Williams' release, out of the presence of Mr. Williams.

"42) Deputy Grimes was advised that the release of Mr. Williams would be acceptable but that Deputy Grimes should contact a Deputy District Attorney.

"43) Deputy Grimes attempted to contact Jonathan Fussner, a Deputy Lane County District Attorney, but was unable to do so.

"44) Deputy Grimes left word for Mr. Fussner to contact him.

"* * * * *

"46) Mr. Williams was also advised of the existence of a number of warrants for his arrest based upon traffic charges in the Eugene Municipal Court.

"47) Mr. Williams was advised that the total bail for these traffic warrants was between $900.00 and $1,000.00.

"48) Mr. Williams knew that the Lane County Custody Referee did not have authority to consider a release on these Municipal Court warrants.

"49) Mr. Williams knew that if he were taken into custody on these warrants he would not be able to post the required bail because of his financial conditions.

"50) Mr. Williams knew that if he were taken into custody on these warrants he would not appear in Court until the following Monday.

"51) Thus, Mr. Williams knew that if he were taken into custody on these warrants he would not be able to attend his brother's wedding that weekend.

"* * * * *

"73)[3] The Court finds that: Mr. Williams asked Deputy Grimes if he would let Williams go if he promised to return on Monday, September 28, 1981. Mr. Williams said his brother was getting married on Saturday, September 26, 1981, and he wanted to attend because he was the best man. Deputy Grimes told Williams that he could not make a decision to release him. Williams then said he would tell Grimes everything he wanted

---

[3]The trial court took findings 73 and 74 from the state's "Objections to Defendant's Proposed Findings of Fact" and substituted them for defendant's proposed findings 45 and 52-57. All other quoted findings were included in defendant's proposed findings.

to know about the robbery if Grimes would let him go until Monday. Deputy Grimes advised him that he could not promise his release, and Williams asked if Grimes would at least try to get him released. Deputy Grimes agreed to call the supervisor to see what could be done.

"74)   Deputy Grimes advised Mr. Williams of these efforts to obtain a release for Mr. Williams. Deputy Grimes then asked Mr. Williams if he wanted to talk about the robbery. Williams said it had been bothering him a lot lately, and he wanted to get it over with. Williams then admitted he had committed the robbery. Mr. Williams said he wanted to talk and then made several other admissions about his involvement in the robbery. During this conversation, Deputy District Attorney Fussner called Deputy Grimes and it was ultimately agreed that Mr. Williams would be released and cited to appear the following Monday. Mr. Williams was so advised by Deputy Grimes. Mr. Williams then agreed to give a tape-recorded statement during which he stated that no threats or promises had been made to get him to give a statement.

"* * * * *

"58)   After the conclusion of the tape recorded statement Mr. Williams was issued a citation by Deputy Pearson to appear in Court in connection with the robbery charge.

"59)   Mr. Williams was then, on the evening of September 25, 1981, released from custody.

"61)   Mr. Williams was somewhat emotionally upset at the time of the statements.

"* * * * *"

The state does not challenge these findings.

On these facts, the trial court found:

"62)   * * * [B]oth the tape recorded statement and the prior [oral] statements * * * made * * * to Deputy Grimes, were the product of two factors:

"A)   The Defendant's remorse and concern over his involvement [in the robbery] and

"B)   The inducement of his release and efforts to obtain his release in exchange for statements acceptable to Deputy Grimes.

"63)   * * * [T]he second such factor made these statements involuntary on the part of Mr. Williams as a matter of fact."

We disagree.

The Supreme Court set forth the test for "voluntariness" in *State v. Shipley,* 232 Or 354, 362, 375 P2d 237 (1962) (citing *Culombe v. Connecticut,* 367 US 568, 602, 82 S Ct 1860, 6 L Ed 2d 1037 (1961):

> "* * * 'Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. * * * If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' "

More recently, in *State v. Mendacino,* 288 Or 231, 239 n 6, 603 P2d 1376 (1980), the court noted that a confession would be considered involuntary if it was "procured by threat or promise, direct or implied."

Applying the "voluntariness" standard, the Supreme Court has held that a suspect who initiates an attempt to "cut a deal" with police or prosecutors by bartering his confession for a favor gives his confession voluntarily. In *State v. Morris,* 248 Or 480, 435 P2d 1018 (1967), the defendant was in custody following an arrest for armed robbery. When he asked police officers if he could speak with the district attorney about the possibility of joining the Foreign Legion, the officers agreed to contact the district attorney. After the police had tried unsuccessfully to reach the district attorney, one of the officers told the defendant that he would "do everything in his power" both to reach the prosecutor and to help the defendant join the Foreign Legion. However, the officers testified that they advised the defendant "that they could not make a deal with him, that this could be done only by the district attorney with the consent of the court." They also testified that they made no promises to the defendant except "to take his message to the DA's office." Following this conversation with the police, and before the defendant had seen the district attorney, he confessed. His confession was admitted at trial and he was convicted. On appeal to the Supreme Court, he claimed that his confession was not voluntary, because it had been induced by the police officers' promises. The court disagreed:

> "It is quite clear from the * * * record that no promises of benefit or hope of benefit were held out to the defendant to obtain his confession. The officers merely agreed to make

known his desires to the district attorney, and this was done."
248 Or at 482-83.

The facts of the instant case are remarkably similar to the facts in *Morris.* The trial court's findings demonstrate that Deputy Grimes and Deputy Pearson were both careful not to promise defendant immediate release in exchange for his confession. As in *Morris,* the officers agreed only to forward defendant's request to the officials with authority to "deal" with him. The historical facts found by the trial court show that, while defendant may have felt impelled by his desire not to disappoint his brother, the only "promise" made to defendant by the police was a promise to convey a request—a promise made without any effort by the officers to make that conveyance contingent on anything. Defendant's confession was freely given, without the influence of "threat or promise, direct or implied."[4] The trial court erred in suppressing the confession on the ground that it was involuntary.

The state next attacks the trial court's determination that defendant's statements must be suppressed because they were taken in violation of the constitutional principles enunicated in *Edwards v. Arizona, supra.*[5] *Edwards* dealt with the

---

[4] Defendant's hope that his confession would gain him an early release does not invalidate his confession, *see State v. Rollwage,* 21 Or App 48, 533 P2d 831 (1975); *Nunn v. Cupp,* 15 Or App 212, 515 P2d 421 (1973), because it was not induced by promises by Pearson or Grimes.

[5] The pertinent trial court findings were:

"68) The Court expressly finds that to the extent that the prohibition on recontacting Mr. Williams after his earlier assertion to the same deputy of his rights to silence and particularly to an attorney, as enunciated in *Edwards v. Arizona,* 101 S Ct 1880 (1981), implicates Mr. Williams' rights under the Sixth Amendment to the United States Constitution and under the Oregon Constitution, Article I, Section 11, specifically Mr. Williams' right to counsel, this was violated in this particular case, as a matter of fact, by the recontact associated with the arrest of September 25, 1981.

"69) Therefore, as a matter of law, the Court expressly finds that all such statements were obtained in violation of the defendant's constitutional rights to counsel under the above provisions and cases interpretive thereof such as *Brewer v. Williams,* 430 US 387, 97 S Ct 1232 (1979), *McLean v. Ohio,* 381 US 356, 85 S Ct 1556 (1964), *Massiah v. United States,* 377 US 201, 84 S Ct 1109 (1969) and particularly *Edwards v. Arizona, supra."*

We note that, contrary to the trial court's apparent assumption, *Edwards v. Arizona, supra,* is not a Sixth Amendment right to counsel case. Instead, it was decided on the basis of "the Fifth and Fourteenth Amendments as construed in *Miranda v. Arizona,* [384 US 86 S Ct 1602, 16 L Ed 2d 694 (1966)] * * *." 451 US at 480.

admissibility of statements made by a defendant during custodial interrogation, after the defendant has requested counsel but before he has had an opportunity to consult with counsel. The principles therefore do not apply unless the individual under interrogation has asserted his right to counsel. Defendant in this case did not do so.

■   In May, 1981, when defendant was first arrested in connection with the robbery, he requested counsel and counsel was provided. However, the court dismissed the information filed against defendant at that time, terminating that criminal proceeding. When defendant was rearrested four months later, he was not then represented by counsel; the earlier representation had terminated with the earlier charge. He was again advised of his rights, but he did not request counsel. Defendant had successfully asserted his right to counsel before, and it is clear that he understood that right and was capable of taking full advantage of it, if he desired.[6] His decision not to request counsel at the time of his second arrest can only be viewed, in its factual context, as a voluntary, knowing and intelligent waiver of his Sixth Amendment right. *Edwards v. Arizona, supra,* does not apply to the facts of this case; the trial court erred by suppressing defendant's statements on the basis of *Edwards.*

Having rejected both of the trial court's reasons for suppressing defendant's statements, we next consider his alternative claim that his confession was the product of an illegal arrest.

■   The trial court found that no warrant had been issued for defendant's arrest in connection with the robbery and that no exigent circumstances attended his apprehension. However, the court held that the arrest was legal, because it was authorized by ORS 133.310(1)(a).[7] Defendant argues that both the statute and the arrest violate Or Const, Art I, § 9.[8] We need

---

[6] The trial court found "there's no question but that he knew his rights * * *."

[7] That statute permits a police officer to make a warrantless arrest

"* * * if the officer has probable cause to believe that the suspect has committed * * * [a] felony * * *."

[8] Or Const, Art I, § 9 provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no

need not decide this constitutional question, because the arrest was authorized by another statute, whose constitutionality defendant does not attack.

ORS 133.310(2) provides:

"A peace officer may arrest a person without a warrant when the peace officer is notified by telegraph, telephone, radio or other mode of communication by another peace officer of any state that there exists a duly issued warrant for the arrest of a person within the other peace officer's jurisdiction."

At the hearing on defendant's motion to suppress, Pearson testified that he had run a records check on defendant a day or so before the arrest and discovered that he was "wanted on some warrants from [the] Eugene Police Department." Pearson testified that at the time of the arrest; he informed defendant that he was under arrest "for Robbery in the First Degree *and outstanding warrants* from the Eugene Police Department."

Because the arrest was a valid execution of the Eugene warrants,[9] we do not consider the constitutional ques-

---

warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[9] That Pearson arrested defendant partly because he was suspected of a robbery and that no arrest warrant had been issued in connection with that offense does not invalidate the otherwise legal arrest.

Although the trial court's extensive findings of fact do not include an express finding that Pearson was aware of the Municipal Court warrants when he made the arrest, we are satisfied that that fact was established and recognized by the trial court. It is undisputed that, as of September 25, 1981, there were a number of outstanding Municipal Court warrants authorizing defendant's arrest. Pearson's uncontradicted testimony stated that he was aware of the warrants when he arrested defendant. Moreover, the trial court refused to find that Pearson had made a warrantless arrest. Defendant's proposed findings of fact included the following:

"25) This arrest was not pursuant to any warrant whatsoever."

The state objected:

*"Finding 25* - Defendant's proposed finding is contrary to the evidence that Eugene Municipal Court warrants existed and were known to exist by the arresting officer." (Emphasis supplied.)

Beside this objection, the trial court made the notation: "OK." As a result, finding 25 was not included in the finding of fact adopted by the court. These events constitute an implicit finding by the trial court that the arrest was based, in part, on the Eugene warrants.

tion that defendant raises. *See Gortmaker v. Seaton,* 252 Or 440, 442, 450 P2d 547 (1969); *see also Northwest Natural Gas v. Georgia Pacific Corp.,* 53 Or App 89, 630 P2d 1326 (1981).

Defendant's confession was voluntarily given after a valid arrest and a voluntary, knowing and intelligent waiver of his Sixth Amendment right to counsel. There is no basis for its suppression.

Reversed and remanded for trial on appeal; affirmed on the cross-appeal.

---

Defendant's release *may not* have been procedurally proper given the existence of the Municipal Court warrants. (*See* finding of fact 46-51, *supra*). That, however, is a question that does not concern us here, because it was not raised by either party. We hold only that the arrest was valid under ORS 133.310(2), because Pearson was aware of the Municipal Court warrants when he arrested defendant and intended to execute them.