Argued and submitted February 27, affirmed December 17, 1997, petition for review denied April 21, 1998 (327 Or 123)

STATE OF OREGON,
*Respondent,*

*v.*

MARVIN LEE GOREE,
*Appellant.*

(9411-37927, 9501-30442;
CA A91090 (Control), CA A91091)

950 P2d 919

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson,* Judges.

LANDAU, J.

---

* Leeson, J., *vice* Richardson, S. J.

## LANDAU, J.

Defendant appeals a judgment of conviction for felony murder. His single assignment of error is that the trial court should have granted a motion to suppress evidence of statements that he made to his girlfriend during her visits to him in jail. He contends that the statements were obtained unlawfully, because his girlfriend—working as an agent of the police—elicited them through promises of marriage and promises that other pending charges against him would be dropped. He contends alternatively that the statements should have been suppressed because she failed to advise him of his constitutional rights. We affirm.

Defendant was arrested on charges of attempted murder, kidnapping and menacing of his girlfriend, Kimla Dobbins. Defendant was kept in custody and received appointed counsel on those charges. While police questioned Dobbins about the attempted murder, kidnapping and menacing charges, she mentioned that defendant had told her about an unrelated assault of someone who had lived on Blandena Street in Portland. Police had been investigating the death of Michael McDonald, who had been killed approximately three weeks earlier at his residence on Blandena Street, and defendant was a suspect in that investigation. Dobbins suggested that she wear a concealed recording device and attempt to obtain a confession from defendant concerning the McDonald homicide.

The investigating officers obtained a warrant to record conversations between Dobbins and defendant and arranged for her to meet with him in jail. Dobbins met with defendant on two occasions, a week apart. Before each meeting, the officers fitted her with a body wire, showed her how it operated and instructed her on what questions she should and should not ask defendant. Before the second meeting, the officers also discussed with Dobbins a recent newspaper article about the McDonald killing. During the course of the investigation, the officers gave Dobbins vouchers to pay for housing, food and gas.

Dobbins met with defendant in the visitor rooms at the jail. The visitor rooms consisted of two rooms separated

by a plexiglass window; the two communicated by phones. At the first meeting, Dobbins explained to defendant that she wanted "to start fresh. I want us to start over." She said that the only way to do that "is to clean the slate." She then asked defendant about the McDonald killing:

"Dobbins: Okay, now, um. I wanna know, uh. 'Member that house you took me by?

"[Defendant]: What house?

"Dobbins: That house.

"[Defendant]: Where?

"Dobbins: I don't know, over there by . . .

"[Defendant]: Where you left me.

"Dobbins: Noooo, over there by the Plaid Pantry.

"[Defendant]: (unintelligible)

"Dobbins: 'Member when you made me drive by over there?

"[Defendant]: Hm, hm, tell me.

"Dobbins: I wanna know what happened.

"[Defendant]: (unintelligible-whisper)

"Dobbins: What?

"[Defendant]: (unintelligible whisper)

"Dobbins: They can't hear nothin' on these phones.

"[Defendant]: What house?

"Dobbins: That house.

"[Defendant]: What house?

"Dobbins: You know what house.

"[Defendant]: Why (unintelligible).

"Dobbins: What? Well you're gonna have to tell me the truth.

"[Defendant]: Who's trying to get me, the police?

"Dobbins: No, they're not.

"[Defendant]: They is!

"Dobbins:   They never even brought that up to me.

"* * * * *

"[Defendant]:   What are you talking about?

"Dobbins:   I'm talking about that guy's house that you told, that you took me by over there, by Mike's.

"[Defendant]:   (unintelligible)

"* * * * *

"Dobbins:   'Member when, wait. Pick up the phone.

"[Defendant]:   (unintelligible) Dead.

"Dobbins:   Dead. He's dead?

"[Defendant]:   Shut up.

"Dobbins:   Nobody can hear me * * *.

"* * * * *

"Dobbins:   N'kay. Well I wanna know. Well I need to know the truth about some things bef-fore we stay . . .

"[Defendant]:   (unintelligible)

"Dobbins:   . . . together.

"[Defendant]:   . . . I can't tell you about that babe! All right? That right there, I don't know what happened. Okay?

"Dobbins:   Well.

"[Defendant]:   I told you what I did, okay?"

The conversation shifted to other matters, including Dobbins's children, defendant's need for money and his need for help in getting a California parole hold lifted. At that point, defendant raised the subject of Dobbins's continued fidelity:

"[Defendant]:   Let me see your neck.

"Dobbins:   Ohhh, look. I'm not gonna sit here and go through that. No. I'm not gonna sit here and go through that, that's re-, that's totally ridiculous. Let me see yours. Look at that hickey right there. (laughs) Mo. Look. Okay? I'm not doin' nothin', okay? Obviously I still love ya. I'm here.

"[Defendant]:   (unintelligible)

"Dobbins:   I didn't press no charges, did I? On noth', none of that. 'Kay? So what does that tell you? It's the same thing as always . . .

"[Defendant]:   Hey, hey . . .

"Dobbins:   . . . I'm, um, always tried to help you baby."

Dobbins eventually returned to the subject of McDonald's killing, and defendant said that he and two other men went to McDonald's house because they had heard that McDonald had "10 birds. 10 fuckin' keys, okay?" He explained that they did not get anything and that, although they gave McDonald a bloody nose, McDonald was standing when they left.

At the second meeting, Dobbins told defendant that she had talked to the two other men who were with defendant at McDonald's house and that they told her a different story about the incident than defendant had told her. She also mentioned that she had read the newspaper article about the killing and wanted a further explanation from defendant:

"Dobbins:   Listen. You're gonna tell me and you're gonna tell me the truth. And I'm gonna know if it's the truth or not.

"[Defendant]:   (inaudible)

"Dobbins:   Because, I've already talked to the couple of people. You're gonna tell me the truth or I'm gonna get up and I'm gonna walk out of here and you're never gonna see me again and I'm not gonna help you do shit.

"[Defendant]:   Just wait mama.

"Dobbins:   'Kay?

"[Defendant]:   What?

"Dobbins:   Now you tell me exactly what you did to that man.

"[Defendant]:   I told you mama.

"Dobbins:   No you didn't.

"[Defendant]:  I told you all I did was beat the man up babe and take some dope. That's all. Okay?"

The conversation veered to other matters. Eventually, defendant said that he wanted to marry Dobbins. She replied that she did not want to marry him, because he was not telling her the truth. At that point, defendant emphatically demanded that Dobbins listen to him carefully:

"[Defendant]:  . . . Let me tell you what I did.

"Dobbins:  Yes.

"[Defendant]:  I went in and man he came outside to feed the cat . . .

"Dobbins:  (cleared throat).

"[Defendant]:  . . . And I grabbed him the motherfucker, ran him inside . . .

"Dobbins:  Um-hm.

"[Defendant]:  . . . body slammed his ass.

"Dobbins:  Um-hm.

"[Defendant]:  Banged him two, three times."

Dobbins asked defendant how McDonald died, and defendant replied that he did not know. He then asked Dobbins to call the California parole authorities and questioned whether Dobbins had reunited with a former boyfriend. Dobbins turned the conversation back to the McDonald killing. She told defendant that she thought that he had beaten McDonald more seriously than defendant had earlier described:

"Dobbins:  What did you slam his head on?

"[Defendant]:  Nuttin'. Nuttin' there.

"Dobbins:  Well what did you do that for then?

"[Defendant]:  I slammed him on the floor.

"Dobbins:  You slammed him on the floor?

"[Defendant]:  Yeah, uh. Hey, believe me, okay? Will you do that? All right . . .

"Dobbins:  Well I'm havin' a hard time believing you.

"[Defendant]:  Shit. You know you got me startin' to think maybe you investigating somethin' or gonna go do something.

"Dobbins:  I'm not gonna do nothing, okay. I just wanna know the truth. If I'm gonna stay with ya, I'm gonna marry you.

"[Defendant]:  I'm askin' ya dear.

"Dobbins:  I'm gonna marry you, I wanna know the whole truth about this before I get any further along in my life with you.

"[Defendant]:  Okay. I'm telling you, your baby didn't do it. Now can you believe me?

"Dobbins:  I don't believe you for some reason, I just think there's just a little bit more to it.

"[Defendant]:  Mama. If I did it, I'd tell you I did it.

"* * * * *

"Dobbins:  I'm not sayin that you killed him, okay? I'm just sayin that you beat him up real bad.

"[Defendant]:  Babe, I might of beat him up babe. I only hit the motherfucker three or four times, I didn't beat him up. I only hit (unintelligible) the big white boy, eh, eh, up here one time baby, knock him down. Dropped him to his knees."

Defendant was charged with the murder of McDonald and with kidnapping Dobbins. Before trial in both cases, defendant moved to suppress the statements obtained by Dobbins during her jail visits. The trial court consolidated arguments on the motions and issued a single opinion. The court first denied the motion to suppress the statements in the felony murder case and gave the following explanation:

"Ms. Dobbins was a police agent. While she volunteered for the job and was basically self-directed, she was under the direction of [the police].

"* * * * *

"Defendant had and still has some mental and emotional limitations. Ms. Dobbins was aware of that fact and used her knowledge of defendant to try to push the right buttons

to get an admission. This much is clear from the transcript. However, it is also clear from the same transcript that the defendant knew he had an option not to talk about the murder with Ms. Dobbins. Defendant controlled much of the conversation. He may have felt that she would do him favors or reengage the relationship if he cooperated, but that is not on the same level as official police interrogation with the obvious ability of a police official to recommend leniency or harsher treatment. Ms. Dobbins clearly could not assist defendant on the murder charge nor on his custody status which clearly included a California parole hold. Defendant's somewhat restricted mental abilities did not prevent him from having and knowing his clear options or knowing that he could refuse to speak and no police official would take action one way or the other.

"Defendant's recorded statements about the murder were, under the totality of the circumstances, voluntary and defendant's motion to suppress is denied."

The trial court then granted the motion to suppress the same statements in the kidnapping case. The trial court gave the following explanation:

"Ms. Dobbins is the victim and chief witness in that case. She was directed not to discuss those pending cases and by the plain reading of the transcript she tried hard to avoid discussions in that area. However, she knew the state would have a difficult time prosecuting those charges without her testimony, she knew defendant knew this fact, and she, in effect, promised to 'drop the charges' if defendant came clean about the murder. This fact forced defendant, as a practical matter, to speak about those other charges which was not the purpose of Ms. Dobbins' visit.

"In that respect she became the equivalent of a police official in the sense that she had some significant control over the defendant's fate as to those other charges. While she could not legally 'drop the charges,' she clearly could have an impact on the outcome of that case. Defendant's efforts to pursue her promise to drop the charges and his statements regarding that case were made in an atmosphere too coercive for this Court to find voluntariness of those statements by a preponderance of evidence. Because of the manner in which Ms. Dobbins brought up the kidnapping case it appears defendant's Sixth Amendment rights may also have been breached."

Following a trial to a jury, defendant was convicted of felony murder of McDonald and was sentenced to approximately 20 years' incarceration.

On appeal, defendant asserts that the trial court erred in denying the motion to suppress for two reasons. First, he argues that the trial court should have suppressed the statements, because they were involuntary. Second, he argues that the statements should have been suppressed, because Dobbins failed to advise him of his constitutional rights before questioning him.

■     As to his first argument, defendant contends that his statements were obtained in violation of ORS 136.425(1), which provides, in part:

> "A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats * * *."

He further contends that the statements were obtained in violation of Article I, section 12, of the Oregon Constitution, which provides that no person may be "compelled in any criminal prosecution to testify against himself," and of the Fifth Amendment prohibition against self-incrimination.[1] According to defendant, he gave his statements under compulsion or fear because Dobbins repeatedly had threatened not to marry him unless he "came clean" on the McDonald homicide and, more importantly, she threatened not to drop the kidnapping charges. The state concedes that admissions obtained by express or implied promises of immunity or leniency are involuntary as a matter of law. It nevertheless contends that there were no such promises in this case:

> "The only promises that defendant might have understood from his conversations with Dobbins were promises that she would not press charges against him for the crimes he

---

[1] Defendant contends that the analysis under the statute and the state and federal constitutions is essentially the same. We do not address the accuracy of that contention. Compare *State v. Foster*, 303 Or 518, 525-26, 739 P2d 1032 (1987) (holding that separate application of ORS 136.425(1) must precede consideration of constitutional issues) with *State v. Smith*, 301 Or 681, 697, 725 P2d 894 (1986) (plurality opinion holding that Article I, section 12, of Oregon Constitution "includes and guarantees" the same protections afforded by the statutory rule).

committed against her and she would consider marrying him. Defendant never suggested that he understood that if he told Dobbins the truth he would receive some kind of immunity for the McDonald murder, and no reasonable person in defendant's place could have understood that Dobbins had any power over a possible prosecution for the McDonald murder."

According to the state, citing *State v. Aguilar*, 133 Or App 304, 891 P2d 668 (1995), Dobbins's promise of leniency on the kidnapping charge simply is irrelevant.

█ In reviewing the trial court's decision with respect to the voluntariness of admissions, we accept the court's findings of fact if any evidence supports them, but review the court's legal conclusions as a matter of law. *State v. Pollard*, 132 Or App 538, 543, 888 P2d 1054, *rev den* 321 Or 138 (1995). A confession or admission is deemed involuntary unless the state affirmatively proves, by a preponderance of the evidence, that it was made voluntarily. *State v. Stevens*, 311 Or 119, 135-37, 806 P2d 92 (1991). A statement was made voluntarily if, under the totality of the circumstances, it is apparent that "defendant's will was not overborne and his capacity for self-determination was not critically impaired." *State v. Vu*, 307 Or 419, 424-25, 770 P2d 577 (1989). Voluntariness is determined without regard to the truth or falsity of the confession. *State v. Hart*, 309 Or 646, 649 n 2, 791 P2d 125 (1990) (quoting *State v. Brewton*, 238 Or 590, 603, 395 P2d 874 (1964)); *State v. Rollwage*, 21 Or App 48, 50, 533 P2d 831 (1975) (quoting *State v. Shipley*, 232 Or 354, 362, 375 P2d 237 (1962)).

█ A confession or admission that was obtained by a promise of immunity or leniency on the same charge is involuntary as a matter of law. *State v. Ely*, 237 Or 329, 334, 390 P2d 348 (1964); *Pollard*, 132 Or App at 543. The promise need not be express; an implied promise of immunity or leniency is sufficient to require suppression. *Pollard*, 132 Or App at 544. It bears emphasis, however, that the invalidating effect of a promise of immunity or leniency *as a matter of law* applies only to the charge with respect to which the promise was given. Said another way, a promise of immunity or leniency on one charge in exchange for an admission concerning

a different charge does not vitiate the voluntariness of the admission. As we explained in *Aguilar*:

> "In every case that we have found, the confession that is rendered involuntary as a matter of law by virtue of an offer of immunity is the one that relates to the crime for which the offer of immunity is made. It is assumed that when a person confesses in response to a promise that the person will not be charged with the crime for which the confession is made, the person's confession is not the product of an essentially free and unconstrained choice.
>
> "Our research reveals no case in which it has been held that a confession elicited as a result of an offer of immunity *with respect to other crimes* is involuntary *as a matter of law*. In that context, we hold that the court must conduct a factual inquiry as to the voluntariness of the confession, as with any other confession. The fact that the promise of immunity was made in exchange for defendant's confessions to *all* the crimes is certainly relevant to the voluntariness of the confession to the first robbery, but it is not in itself determinative."

*Aguilar*, 133 Or App at 309 (emphasis in original; citations omitted). Thus, in a case in which a defendant made admissions as to one crime induced by a promise of leniency concerning a different crime, we must determine whether, under the facts of the particular case, the admission was made voluntarily. *Id.*

■ To conclude that a defendant's will was overborne or that his capacity for self-determination was impaired by a promise of leniency requires findings that the defendant understood that there was, in fact, a promise of leniency, that the defendant's understanding to that effect was reasonable, that the defendant actually relied on that promise in confessing and that the defendant was reasonable in doing so. *Id.* at 307-08; *see also Pollard*, 132 Or App at 549 (confession must actually be induced by contemporaneous *quid pro quo*); *State v. Williams*, 64 Or App 448, 455 n 4, 668 P2d 1236, *rev den* 296 Or 120 (1983) (defendant's hope that confession would gain him early release did not warrant suppression unless it was induced by promises of early release); *State v. Morris*, 32 Or App 457, 460, 574 P2d 350, *rev den* 282 Or 537 (1978) (in

the absence of reasonable reliance on a promise of leniency, suppression of confession held improper).

In this case, the trial court carefully reviewed the taped conversations between defendant and Dobbins. The court concluded that Dobbins did act as an agent of the state and that she did promise at least implicitly to aid defendant—perhaps to marry him, as well—if he would "come clean" on the McDonald homicide. Those findings are supported by the evidence. The trial court also found that Dobbins effectively promised to drop the kidnapping charges if defendant told her the truth about the murder. Our examination of the record reveals no such *quid pro quo*. Dobbins's only mention of not pursuing the kidnapping charges was made in response to defendant's suggestion that she had been unfaithful to him. Still, defendant may have understood the remark to suggest more generally that she had the power to have an effect on the prosecution of the kidnapping case if he displeased her in some way, and so we do not disturb the trial court's finding in that regard. The trial court also found, however, that defendant controlled much of the conversations with Dobbins, that—in spite of Dobbins's attempt to "push the right buttons to get an admission"—defendant knew that he had the option not to talk with her about the McDonald homicide and knew that, if he did refuse to speak, the police could take no action against him one way or the other. On that basis, the trial court concluded that defendant's admissions were made voluntarily.

We turn, then, to the correctness of the trial court's decision. The court found that Dobbins acted as an agent of the state and that, at least implicitly, she promised leniency on the kidnapping charges. That is troubling, to be sure, and it is the principal focus of defendant's argument that his statements were not made voluntarily. But the fact that Dobbins mentioned the possibility of withholding her own cooperation as the sole witness on the kidnapping charges, by itself, is insufficient to vitiate the voluntariness of defendant's statements. *Aguilar*, 133 Or App at 309. For defendant to prevail on the point it must be evident that he reasonably understood Dobbins's mention of the kidnapping charges to amount to a proffered trade for his confession to murder and that he actually and reasonably relied on that understanding

in making the statements to her. *Pollard*, 132 Or App at 549; *Williams*, 64 Or App at 455 n 4.

The trial court made no such findings, and, under the circumstances, we must assume that it found to the contrary. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (if trial court failed to make particular findings, "we will presume that the facts were decided in a manner consistent with the ultimate conclusion, e.g., voluntariness or lack thereof, made by the trial court"). In any event, there is no evidence that defendant actually understood that his statements would purchase leniency of any sort, or that he actually relied on Dobbins's implied promise with respect to the kidnapping charges in speaking with her about the murder. Defendant's arguments on the point rest on the speculation that he could have so understood and relied on Dobbins's statements and that, in the light of his relative lack of intelligence, we should assume that he did. Such speculation and assumptions are not consistent with our standard of review.

Defendant points to other promises of assistance from Dobbins, particularly her more explicit demand that he "come clean" if he expected her to marry him. Dobbins did more explicitly offer a *quid pro quo* in insisting that defendant tell her the truth about McDonald's murder if he expected her to marry him. Nevertheless, the trial court did not find that defendant relied on the promise in talking to Dobbins. To the contrary, the court found that, at all times, defendant knew that he did not have to talk to her about the murder. Moreover, defendant does not explain—and the record in this case does not reveal—how the threat of breaking off a romantic relationship was so powerful an inducement to defendant that his will was overborne and his capacity for self-determination was critically impaired. Particularly in the light of the trial court's finding that, at all times, defendant was well aware that he did not need to talk to Dobbins, we are unpersuaded by defendant's argument. Under the totality of the circumstances, therefore, the trial court was correct in concluding that the state carried its burden of demonstrating, by a preponderance of the evidence, that defendant made the admissions to Dobbins voluntarily.

■ As to his second, alternative, argument in support of his assignment of error, defendant contends that, because Dobbins acted as a police agent and because defendant was in full custody while she talked to him, he was entitled to receive warnings that he had the right to refrain from testifying against himself under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), and Article I, section 12, of the Oregon Constitution. The state contends that the need to provide constitutional warnings is not triggered by the fact that defendant was in custody or that he was talking to a police agent; instead, it is triggered by coercive circumstances in which a defendant has reason to believe that his listeners have legal authority to force him to answer questions. Thus, the state argues, because defendant never knew that Dobbins was acting in any official capacity, constitutional warnings were not required.

Defendant's federal constitutional contention is readily answered. In *Illinois v. Perkins*, 496 US 292, 110 S Ct 2394, 110 L Ed 2d 243 (1990), the United States Supreme Court held that *Miranda* warnings are not required when a suspect is unaware that he or she is speaking to a law enforcement officer and gives an otherwise voluntary statement to the officer. *Id.* at 294. The Court explained:

> "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda. The essential ingredients of a 'police dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisals for remaining silent or in the hope of more lenient treatment should he confess.

> "It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation. We reject the argument that Miranda warnings are required whenever a suspect is in custody in a technical

sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist. * * * When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners. * * *

"Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. As we recognized in Miranda, '[c]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.' Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns."

*Id.* at 296-97.

In this case, the same reasoning applies. Defendant did not know that Dobbins was acting as an agent of the police. Although at one point in his conversations with Dobbins, her persistent questioning prompted him to inquire whether she was working for the police, she denied that she was, and defendant apparently accepted that denial. Thus, as in *Perkins*, defendant had no reason to think that Dobbins had any power over him. In fact, he knew that he was free to leave the visiting room at any time. The fact that Dobbins was, unbeknownst to defendant, an agent of the police does not mean that she was required to provide defendant with *Miranda* warnings.

■ Defendant's state constitutional argument may not be answered so summarily. Under Article I, section 12, *Miranda* warnings are required when a defendant is in "full custody" or is in a setting that judges and law enforcement officers would recognize as "compelling." *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987). The stated rationale for the rule tracks the reasoning expressed in *Perkins*, namely that suspects not be put into situations in which they are likely to

feel psychologically compelled to testify without the benefit of a clear warning that they do not have to do so. *See, e.g., State v. Taylor*, 249 Or 268, 271, 437 P2d 853 (1968) (noting that the rationale for *Miranda* is "the danger of *compulsory* self-incrimination that arises out of the psychological effect of the custodial atmosphere which tends to overpower the mental resistance of a suspect or an accused when questioned") (emphasis in original).

The precise nature of the "custody" or other circumstances that trigger the need to provide *Miranda* warnings has not been articulated by the courts. The Oregon Supreme Court has explained what it includes, but not what it necessitates:

"It is not a term of statutory or constitutional law, and we find it unnecessary to define it here. The concept obviously includes extended official detention in a cell or another enclosure, with or without booking or deprivation of personal belongings. But an enclosure is not essential; one would hardly dispute that a person handcuffed on the street or in his own home is in 'full custody.' The concept of 'full custody' is important and useful in the sense that it informs officers of a point at which no further question about the need to warn a detained person arises; the term describes a sufficient but not a necessary condition. Its usefulness ends when it shifts attention away from the effect of questioning in another form or setting that judges would and officers should recognize to be 'compelling' to a debate whether the setting meets a judicial concept of 'full custody.' "

*Magee*, 304 Or at 265. Clearly, the focus is not on the setting alone, that is, whether the suspect is questioned at home, on the street or in a police bureau office; the focus is instead on the extent to which the particular circumstances *of the questioning* create an environment in which the suspect reasonably will feel compelled to answer the questions of the police.

Thus, merely because a suspect is questioned while being held in a corrections facility does not necessarily mean that he or she is in "custody" for the purposes of determining whether *Miranda* warnings are required. On point in that regard is *State v. Smith*, 310 Or 1, 791 P2d 836 (1990). In that case, the defendant was being held at a county correctional treatment facility pursuant to a condition of probation; he

was not free to leave the facility without violating the terms of his probation. Detective Adams went to the facility to talk to the defendant about a missing person case. The defendant agreed to meet with Adams and, in the course of that meeting, made statements to Adams that implicated him in the missing person case. Ultimately, the defendant was charged with aggravated felony murder, and he moved to suppress the statements that he made to Adams while at the corrections facility. He argued that, because he was not free to leave the corrections facility, he was in "custody," and should have been given *Miranda* warnings before being asked any questions in connection with the missing person case. The Supreme Court rejected the argument:

> "[T]he source of this inability [to leave] was not Detective Adams; defendant could not leave the Center because leaving might violate defendant's separate probation agreement with the state. Further, as the state points out, defendant could have left the *room* without leaving the Center. By leaving the room, defendant could have terminated the interview without violating any condition of his probation."

*Id.* at 9 (emphasis in original).

In this case, although defendant was being held on the kidnapping charges and was not free to leave the jail, the source of his inability to leave was not Dobbins. He could not leave the jail because he was being held on unrelated kidnapping charges. He met with Dobbins on his own volition. He did so in a visiting area in the jail facility that consisted of two rooms separated by a plexiglass wall and talked to her by a telephone. He knew that he was under no compulsion to answer any of her questions. He knew that he could leave the room and terminate the visit at any time. As in *Smith*, therefore, even though defendant was being held in a facility he was not at liberty to leave, the circumstances of the questioning were not compelling, and no *Miranda* warnings were required.

Defendant insists that *Miranda* warnings were required under a different portion of the *Smith* decision, in which the court held inadmissible statements given to a "jailhouse informant" who was acting as an agent of the police. Defendant, however, reads *Smith* too broadly. In *Smith*, the

defendant made statements to a cellmate who, in turn, reported the statements to the police. The defendant argued that, because the cellmate was an agent of the police, the cellmate was obligated to provide *Miranda* warnings before eliciting incriminating information from the defendant. The Supreme Court held that no warnings were required, because the cellmate acted on his own and not at the instigation of the police. *Id.* at 14-15. The court did adopt a rule that *Miranda* warnings are required when " 'the police were directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting [the informant's] activities.' " *Id.* at 13 (quoting *State v. Lowry*, 37 Or App 641, 651, 588 P2d 623 (1978) *rev den* 285 Or 195 (1979)).

The rule announced in *Smith* cannot be divorced from the facts of that case, which were that the defendant was confronted by the agent in a jail cell that he could not leave. If the rule were applied broadly to any statements made to an agent of the police—without regard to whether a defendant was in custody or under compelling circumstances at the time—it would be impossible to conduct any undercover investigation. The law, not surprisingly, is to the contrary. In *State v. Harris*, 21 Or App 174, 534 P2d 202 (1975), for example, the defendant argued that statements he made to an undercover agent that he believed to be an accomplice should have been suppressed, because the undercover agent failed to provide *Miranda* warnings. Even though the undercover agent clearly was a police officer, we rejected the defendant's argument, because the "[d]efendant was not then, or at any time prior thereto, in custody." *Id.* at 177.

We conclude that the trial court was correct in determining that the circumstances of Dobbins's questioning of defendant did not require *Miranda* warnings and that the trial court, therefore, did not err in denying defendant's motion to suppress.

Affirmed.