Argued and submitted December 22, 2006, resubmitted en banc June 7,
reversed and remanded July 25, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## THOMAS B. HUTCHINS,
*Defendant-Appellant.*

Marion County Circuit Court
04C52451; A128171

164 P3d 318

Whitney P. Boise argued the cause for appellant. With him on the brief were Rebecca A. Blaney and Hoevet, Boise & Olson, P.C.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

SCHUMAN, J.

Edmonds, J., dissenting.

**SCHUMAN, J.**

Defendant was convicted of violating ORS 166.275, possession of a weapon by an inmate, based on statements that he made during a disciplinary hearing at the Oregon State Penitentiary (OSP). On appeal, defendant argues that the statute under which he was convicted is unconstitutionally vague as written; that the term "weapon" does not encompass the hypodermic needle and syringe that he was found to have possessed; and that the court erred in admitting the statements that he made at the administrative hearing because he had not been given *Miranda* warnings when he made them. We hold that ORS 166.275 is not unconstitutionally vague, that a hypodermic needle is a "weapon" as defined in that statute, but that the trial court should have granted defendant's motion to suppress his statements. We therefore reverse and remand.

The events giving rise to this case began when an OSP inmate was murdered. Several other inmates, including defendant, were moved from their cells to administrative segregation as part of the subsequent investigation. Later, defendant was moved to OSP's most secure facility, the Intensive Management Unit (IMU). While he was away from the cell that he and a cellmate normally occupied, prison officials searched it and found a hypodermic needle and syringe hidden in a container of protein powder. A disciplinary hearing ensued.

At some point before the hearing, defendant received a form titled "Notice of Hearing—Notice of Inmate Rights." That form contained the following relevant language:

> "You may decline to attend your hearing, however, the hearings officer/adjudicator may make a determination in the case at issue, regardless of whether you appear or not. Additionally, you may not be allowed to attend your hearing if your inappropriate behavior warrants your exclusion from it."

Defendant did not read the form carefully, but he knew from earlier experience that it informed him that he was not required to attend the hearing. Although no prison official ever told defendant or implied to him that nonattendance

would increase the likelihood that he would receive the maximum sanction, he believed that to be the case based on inmate gossip.

After defendant had been in the IMU cell for three days, two correctional officers removed him from the cell using the standard procedure for that facility: they handcuffed defendant, attached him to a leash, and told him to back out of his cell without turning his head to either side. They did not tell him where he was being taken, and they did not inform him that he had the option of not going with them. In fact, they led him to a hearing room, where he was separated from the hearings officer by a window. The only door to his side of the room was locked and could be opened only by a correctional officer in a remote location.

The hearing began with the following dialogue between the hearings officer and defendant:

"[Hearings Officer]: Okay, Mr. Hutchins, you've been charged in this case with [possession of] Contraband I[, in violation of an OSP disciplinary rule]. Shows that you've received a copy of the misconduct report, notice of hearing, inmate rights, and rules of prohibited conduct, is that correct?

"[Defendant]: Yeah, I don't have them with me because they didn't tell me what this was for.

"[Hearings Officer]: Okay. Do you understand your rights[?]

"[Defendant]: I think so.

"[Hearings Officer]: Okay. Well, if you have any questions, feel free to ask me, alright? Okay, the misconduct report states that they did a search of your cell, and, of you and Mr. Robins' cell, and they found a cannister of protein powder located on a shelf, and in it was masking tape with string attached to one end. They examined the contents and found a fully functional syringe with needle and plunger in it. I have a photograph of that needle and plunger. I also have documents here of canteen purchases by you, Mr. Hutchins, for protein powder in July and August.

"[Defendant]: Mm hmm.

"[Hearings Officer]: How do you plead to Contraband I, being in possession of a syringe?

"[Defendant]: (laugh) How much of a difference is it going to make?

"[Hearings Officer]: Well, I'm just, you have four choices, Mr. Hutchins. You can admit the rule violation, deny the rule violation, make no plea to the rule violation, or plead no contest, which means you're not contesting the charges.

"[Defendant]: Okay, I wasn't aware that those are my choices. I'm sorry, I'm a little, a trifle ignorant here. Uuuuh. I, I . . .

"[Hearings Officer]: I'll take a statement from you after I receive your plea.

"[Defendant]: Oh, you don't even have to really worry about that. I don't think I really want to give a statement.

"[Hearings Officer]: Okay, so how do you plea[?]

"[Defendant]: No contest.

"[Hearings Officer]: Alright.

"[Defendant]: That sounds the most reasonable.

"[Hearings Officer]: Okay. And do you have something to say?

"[Defendant]: No, I really don't. Well, I, I,...well, actually, yes. I would, I'm essentially taking responsibility here. I do not want my cellee to be under this same pressure or have to deal with this."

At no time was defendant informed of his right to remain silent or of the fact that what he said could be used against him subsequently in a criminal trial—in other words, he was not *Mirandized*.

Criminal charges were later filed against defendant for violation of ORS 166.275, which provides:

"Any person committed to any institution who, while under the jurisdiction of any institution * * *, possesses or carries upon the person, or has under the custody or control of the person any dangerous instrument, or any weapon including but not limited to any blackjack, slingshot, billy,

sand club, metal knuckles, explosive substance, dirk, dagger, sharp instrument, pistol, revolver or other firearm without lawful authority, is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the custody of the Department of Corrections for a term not more than 20 years."

Defendant demurred to the indictment on the ground that the statute was unconstitutionally vague. The court disallowed the demurrer. Defendant also moved to suppress all of the statements that he had made during the administrative hearing at OSP on the ground that he should have received *Miranda* warnings. The court denied that motion as well. Finally, defendant moved for a judgment of acquittal on the ground that the state had presented no evidence from which a reasonable factfinder could determine that he possessed a "weapon" as that term was defined in ORS 166.275. That motion, too, was denied. On appeal, defendant renews all three of those arguments.

■ ■     In his first assignment of error, defendant asserts that the term "sharp instrument" in ORS 166.275 makes the statute unconstitutionally vague. The Supreme Court has held that a statute suffers from that defect if:

"(1) it permits arbitrary and even retroactive punishment and delegates uncontrolled discretion to judges, juries, and law enforcement personnel to decide what and whom to punish, thereby violating the equal privileges guarantee of Article I, section 20, of the Oregon Constitution, the *ex post facto* prohibition of Article I, section 21, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and it fails to provide fair warning of what kind of orders are unlawful and must be obeyed, also in violation of the Due Process Clause."

*State v. Illig-Renn*, 341 Or 228, 238-39, 142 P3d 62 (2006). However, a term "need not define an offense with such exactitude that a person could determine in advance whether specific conduct in all possible factual circumstances will be found to be an offense." *State v. Page*, 129 Or App 558, 563, 879 P2d 903 (1994). It suffices that a "person[ ] of common intelligence can understand what is prohibited." *Id*. Even presuming that a facial challenge to a statute not involving speech is cognizable, we readily conclude that the term

"sharp instrument" passes constitutional muster. Although we can hypothesize difficult line-drawing situations (for example, a dull pocket knife rusted shut), the terms "sharp" and "instrument" are commonly used and relatively precise. Further, as applied to defendant under the circumstances of this case, it is beyond dispute that what he possessed was both an instrument and sharp.

■    By the same logic, defendant's second assignment of error fails as well. The gist of that argument is that a hypodermic syringe and needle is not—or could not with any certainty be regarded as—a "weapon" as that term is used in ORS 166.275.[1] In support of his position, defendant argues that, because all of the other examples of "weapons" that the legislature specified in the statute are *designed* to be used as weapons ("blackjack, slingshot, billy, sand club, metal knuckles, explosive substance, dirk, dagger, * * * pistol, revolver or other firearm"), the term applies only to those sharp instruments that also are designed as weapons. That argument cannot be reconciled with at least one item on the legislature's list (explosive substance) nor with the plain meaning of the statute, which imposes no such limitation on the term; the statute explicitly states that a "sharp instrument" *is* a weapon when possessed without lawful authority by an inmate, probably because it is *capable* of use as a weapon. *See State v. Larsen*, 44 Or App 643, 651, 606 P2d 1159, *rev den*, 289 Or 373 (1980) (purpose of ORS 166.275 is "to protect institutional security"). In other words, the statute declares that, even if a sharp instrument has innocent or innocuous uses outside of penal institutions, when possessed by an inmate, it *becomes* a weapon.

*State v. Tucker*, 28 Or App 29, 558 P2d 1244, *rev den*, 277 Or 491 (1977), is not to the contrary. In that case, the defendant was charged with carrying a concealed weapon— more specifically, nunchaku sticks—in violation of ORS 166.240, which prohibited the concealing of "any revolver, pistol, or other firearm, any knife, other than an ordinary pocketknife, or any dirk, dagger, slung shot, metal knuckles, *or any instrument by the use of which injury could be inflicted upon the person or property of any other person* * * *." *Tucker*,

---

[1] Defendant was not charged with possession of a "dangerous instrument."

28 Or App at 31 n 1 (emphasis added). The defendant argued that the catch-all phrase emphasized above was unconstitutionally vague. *Id.* at 31. The trial court agreed, and the state appealed. We reversed. *Id.* at 34. Applying *ejusdem generis*, the rule of statutory construction, which "allows the general terms of an act to be modified and limited by the enumeration of specific examples preceding the general language," *id.* at 32, we concluded that the catch-all phrase included only those items that, like the enumerated objects, were "designed and intended primarily as weapons to inflict bodily injury or death." *Id.* at 33.

*Tucker* is inapposite. Unlike ORS 166.275, the statute in *Tucker* contained an open-ended catch-all phrase at the end of a list of specific items—the classic statutory format to which *ejusdem generis* applies. As discussed above, however, "sharp instrument" is not a general term following a list of specifics; rather, it is itself one among a list of specific terms. We conclude that, when the prosecution proved that defendant possessed a hypodermic needle, it proved that he possessed a weapon as defined in ORS 166.275.

■ We also conclude, however, that the prosecution used the self-incriminatory statements that defendant made to the hearings officer at his institutional disciplinary hearing and that, by virtue of the circumstances of that hearing, those statements should have been suppressed because they were obtained in violation of Article I, section 12, of the Oregon Constitution.[2] That provision requires suppression of statements that result from either actual coercion or from the presumptive coercion that occurs whenever a defendant is entitled to *Miranda* warnings and does not receive them. *State v. Gable*, 127 Or App 320, 324, 873 P2d 351, *rev den*, 319 Or 274 (1994). Defendant does not argue that he was actually coerced; his argument focuses on the failure to administer *Miranda* warnings.

■ Those warnings are required before interrogating a suspect who is either in "full custody" or a setting "that judges would and officers should recognize to be 'compelling.'" *State*

---

[2] The dissent calls our resolution of this issue "judicial policy making." We reject that characterization, but we do not believe that debate would be of use to the bench, Bar, or public.

*v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987). When that interrogation takes place inside a jail or prison, the suspect is ordinarily in "full custody" in the sense that he or she is not free to walk away; full custody, in other words, "obviously includes extended official detention in a cell or another enclosure." *Id*. However, as the case law has developed, interrogation during incarceration does not *per se* require *Miranda* warnings. For one thing, as long as the interrogation occurs in an administrative hearing and the statements are not subsequently used in a criminal prosecution, Article I, section 12, is simply irrelevant. *Archuletta v. OWCC*, 25 Or App 149, 548 P2d 1006 (1976). The self-incrimination clause of that section states that no person shall be "compelled *in any criminal prosecution* to testify against himself." (Emphasis added.)

■      Further, even when statements by a person in prison are later used in a criminal prosecution, the prison setting alone is not dispositive. In *State v. Goree*, 151 Or App 621, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998), law enforcement officers put a body wire on the defendant's girlfriend and instructed her to elicit incriminating statements during a jail visit. *Id*. at 623. We held that no *Miranda* warnings were necessary and upheld the trial court's denial of the defendant's motion to suppress, explaining:

> "Clearly, the focus is not on the setting alone, that is, whether the suspect is questioned at home, on the street or in a police bureau office; the focus is instead on the extent to which the particular circumstances *of the questioning* create an environment in which the suspect reasonably will feel compelled to answer the questions of the police.

> "Thus, merely because a suspect is questioned while being held in a corrections facility does not necessarily mean that he or she is in 'custody' for the purposes of determining whether *Miranda* warnings are required."

*Id*. at 637 (emphasis in original). Rather, the determination depends on the circumstances of the particular case. Further, the correct perspective from which to evaluate those circumstances is objective. "The issue * * * is how a reasonable

person *in defendant's position* would have understood the circumstances of his questioning." *State v. Breazile*, 189 Or App 138, 146, 74 P3d 1099 (2003) (emphasis in original).

Here, we conclude that the circumstances under which defendant was questioned were compelling. The only aspect of the situation that militates in favor of a contrary conclusion—and it is a substantial one—is the fact that defendant knew that he could "decline to attend" his hearing. The force of that fact, however, is more than offset by two related facts. First, he knew that, if he chose not to attend, the hearings officer could "make a determination in the case at issue." Thus, the only way he could put his version of events on the record was by waiving his right of nonattendance. Second, and more importantly, when correctional officers came to take him to the hearing, they did not tell him where they were taking him and they did not tell him he had the option of not going with them. Indeed, they ordered him to back out of his cell, applied handcuffs and a leash, and escorted him to what was, to him, an unknown destination for an unknown purpose.

Once there, he remained in handcuffs throughout the hearing, in a room that was conspicuously locked and guarded. He was not told that his plea and his statements could be used in a subsequent criminal trial. He was confronted with evidence against him. And although he had been told that he could "decline to attend," he was never told that, once in attendance, he could choose to terminate the proceedings and be returned to his cell. Nor does the record reveal that to be the case. Rather, he was informed that he had only four choices: confession, denial, no plea, or a plea of no contest. In short, "a reasonable person in defendant's situation would have understood that he was being questioned under compelling circumstances." *Breazile*, 189 Or App at 147. For that reason, the statements he made at the hearing should have been suppressed under Article I, section 12, of the Oregon Constitution.

Reversed and remanded.

**EDMONDS, J.,** dissenting.

Today, a majority of this court makes what amounts to a policy decision under Article I, section 12, of the Oregon

Constitution that has significant consequences to the citizens of Oregon.[1] The majority holds that, if the state wishes to introduce into evidence statements made by a defendant in a prison disciplinary hearing in a subsequent criminal prosecution, those statements must be preceded by *Miranda* warnings given by the hearings officer or someone else.[2] The majority's decision will affect the manner in which prison disciplinary hearings are conducted, or alternatively, it will result in the blanket exclusion of evidence of incriminating statements made by prison inmates during those hearings. Moreover, the majority's decision, in the absence of any compelling prophylactic need for such a rule, is detrimental to the public's interest in having crimes committed in prison facilities prosecuted. For the reasons that follow, I disagree with what is an ill-advised and needless extension by this court of

---

[1] The issue in this case is how far to extend a policy-motivated, judge-made rule under Article I, section 12. That provision of the Oregon Constitution provides that "[n]o person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself." The majority genuinely believes that Article I, section 12, compels the result that it reaches, and, therefore, it is not making a policy decision. I disagree: The *Miranda* rule was a policy choice made by the members of the United States Supreme Court in 1966; whether to extend or not to extend the *Miranda* rule to prison disciplinary hearings under Article I, section 12, is as much a policy choice for this court to make as it was for the Court in 1966. The majority also believes that its holding is limited to the circumstances of the hearing held in this case. Again, I disagree. The precedential effect of the majority's holding, in light of its reasoning, will be understood to apply to all prison discipline hearings.

[2] *Miranda* warnings are the product of a rule made by the Court that it first announced in *Miranda v. Arizona*, 384 US 436, 444-45, 86 S Ct 1602, 16 L Ed 2d 694 (1966). The Court instructed:

"As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

the *Miranda* rule into a forum that has no relevance to the interests that *Miranda* was intended to protect.

The facts of this case are that, before the disciplinary hearing, defendant, an inmate in the Oregon State Penitentiary, had been in a cell for 36 hours in the Intensive Management Unit (IMU). He had been moved to that cell due to a murder investigation involving another inmate. While housed in the IMU, he received a notice of a pending disciplinary hearing based on the discovery of contraband in the cell from which he had been moved. Defendant was aware that he did not have to attend the hearing. Defendant was removed from his cell in accordance with the standard procedure for that unit and taken to a room where the disciplinary hearing was held. That procedure for moving defendant from the IMU involved defendant being handcuffed, attached to a leash, and being told to back out of his cell without turning his head. He was not informed by the correctional officers why he was being removed from his cell.

When defendant arrived in the room in which the hearing was held, the following colloquy occurred:

"[Hearings Officer]: Okay, we're on the record with case number 0309-A021-A15. * * * [T]oday is September 5. This is a hearing on Thomas Hutchins, 8393156. Mr. Hutchins, will you state your name for the record.

"[Defendant]: Uh, just as you said, Thomas Hutchins.

"[Hearings Officer]: Okay, Mr. Hutchins, you've been charged in this case with Contraband I. Shows that you've received a copy of the misconduct report, notice of hearing, inmate rights, and rules of prohibited conduct, is that correct?

"[Defendant]: Yeah, I don't have them with me because they didn't tell me what this was for.

"[Hearings Officer]: Okay. Do you understand your rights[?]

"[Defendant]: I think so.

"[Hearings Officer]: Okay. Well, if you have any questions, feel free to ask me, alright? Okay, the misconduct report states that they did a search of your cell, and, of you and Mr. Robins's cell, and they found a cannister of protein

powder located on a shelf, and in it was masking tape with string attached to one end. They examined the contents and found a fully functional syringe with needle and plunger in it. I have a photograph of that needle and plunger. I also have documents here of canteen purchases by you, Mr. Hutchins, for protein powder in July and August.

"[Defendant]:   Mm hmm.

"[Hearings Officer]:   How do you plead to Contraband I, being in possession of a syringe?

"[Defendant]:   (laugh) How much of a difference is it going to make?

"[Hearings Officer]:   Well, I'm just—you have four choices, Mr. Hutchins. You can admit the rule violation, deny the rule violation, make no plea to the rule violation, or plead no contest, which means you're not contesting the charges.

"[Defendant]:   Okay, I wasn't aware that those are my choices. I'm sorry, I'm a little, a trifle ignorant here. Uuuuh. I, I...

"[Hearings Officer]:   I'll take a statement from you after I receive your plea.

"[Defendant]:   Oh, you don't even have to really worry about that. I don't think I really want to give a statement.

"[Hearings Officer]:   Okay, so how do you plea[?]

"[Defendant]:   No contest.

"[Hearings Officer]:   Alright.

"[Defendant]:   That sounds the most reasonable.

"[Hearings Officer]:   Okay. And do you have something to say?

"[Defendant]:   No, I really don't. Well, I, I...well, actually, yes. I would, I'm essentially taking responsibility here. I do not want my cellee to be under this same pressure or have to deal with this.

"[Hearings Officer]:   Okay. Well, was he aware the syringe was there in the protein powder[?]

"[Defendant]:   I don't, I do not believe so, no.

"[Hearings Officer]: Okay, and where did you get the syringe?

"[Defendant]: (laugh) Found it.

"[Hearings Officer]: You found it.

"[Defendant]: Yeah, they were shaking down the block, and I'm sure somebody just flung it out of their...

"[Hearings Officer]: And...

"[Defendant]: ...pocket in order to avoid being caught with it.

"[Hearings Officer]: What were you planning on doing with that syringe?

"[Defendant]: I have no idea, ma'am. (laugh) (inaudible).

"[Hearings Officer]: Well, what shelf do you occupy in your cell?

"[Defendant]: Oh, um, the bottom one.

"[Hearings Officer]: The bottom one?

"[Defendant]: Yes, ma'am.

"[Hearings Officer]: And where were your cannisters located at?

"[Defendant]: Well, I think I had some in my drawer and some of my, the protein powder would have been on my shelf.

"[Hearings Officer]: Okay. And how many shelves are in your cell?

"[Defendant]: A total of five, but there are three in that one area.

"[Hearings Officer]: Okay, and you don't occupy the other ones?

"[Defendant]: No, no, the other two were his.

"[Hearings Officer]: Okay. And where was, where was the cannister found, what shelf?

"[Defendant]: I would imagine the bottom one (laugh).

"[Hearings Officer]: Okay.

"[Defendant]: I mean, I wasn't there when they found it, but that's where, that's where I kept all my stuff.

"[Hearings Officer]: Okay, and you're telling me that syringe was yours.

"[Defendant]: Well, possession being nine-tenths of the law, I suppose so, yes.

"[Hearings Officer]: Okay. Alright. How long have you had that syringe?

"[Defendant]: About a day.

"[Hearings Officer]: One day? Okay.

"[Defendant]: I've had a lot of very poor timing and luck here.

"[Hearings Officer]: And where did you find it, the syringe?

"[Defendant]: By the trash."

Answering the question of whether the above facts are the kind of facts that support the majority's policy decision in this case requires an understanding of why the *Miranda* rule was created by the United States Supreme Court in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). In *Berkemer v. McCarthy*, 468 US 420, 433, 104 S Ct 3138, 82 L Ed 2d 317 (1984), the Court explained that *Miranda* warnings operate as a prophylactic measure to ensure the efficacy of the Fifth Amendment guarantee against self-incrimination. Thus, the warnings are designed so

"that the police do not coerce or trick captive suspects into confessing, to relieve the 'inherently compelling pressures' generated by the custodial setting itself, 'which work to undermine the individual's will to resist,' and[,] as much as possible[,] to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary."[3]

---

[3] In the *Miranda* cases, each defendant was questioned by police officers, detectives, or a prosecuting attorney. The Court explained that "[a]n understanding of the nature and setting of * * * in-custody interrogation is essential to our decisions today." 384 US at 445. In support of its holding that prophylactic measures were necessary to prevent coerced confessions because of police practices, the

(Footnotes omitted.) Thus, under the federal constitution, if *Miranda* warnings are not given to a suspect who is being interrogated by law enforcement officials while in custody or under circumstances tantamount to custody, then any statements obtained are presumed to be coerced and involuntary. It bears emphasis that the *Miranda* requirement is a judge-made, policy-based rule.

The majority, however, does not hold that *Miranda* warnings were required in this case under the Fifth Amendment; rather, it concludes that the warnings were required under Article I, section 12, of the Oregon Constitution, which has been held to protect the same interests as the Fifth Amendment. *State v. Magee*, 304 Or 261, 264-65, 744 P2d 250 (1987). There is no precedent in Oregon law that supports the majority's decision. Initially, the Oregon Supreme Court held that "the Oregon Constitution does not require the giving of *Miranda*-type warnings." *State v. Smith*, 301 Or 681, 698, 725 P2d 894 (1986). The following year, however, the court decided *Magee*, in which it appeared to import the *Miranda* rule into Article I, section 12. Three concurring justices wrote separately to reiterate the view expressed in *Smith*, but would have reversed under *Berkemer* and the Fifth Amendment.

---

Court referred to "third degreecases involving police violence where "the police resorted to physical brutality—beatings, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions." 384 US at 446. The Court also pointed to stratagems for psychological coercion in current use and to various police manuals and texts that recommended that interrogations continue for days with no respite from the atmosphere of domination and the use of the "Mutt and Jeff" act during which one interrogator pretends to befriend the defendant while another interrogator relentlessly pursues the subject. The "friend" disapproves of Mutt's tactics, but he cannot hold him off for long. But if the suspect quickly confesses, Jeff will arrange to get Mutt off the case. Other techniques referred to by the Court included the "reverse line up" where the accused is identified by fictitious witnesses in order to induce him to confess and the making of false promises or legal advice intended to overcome the will of the person. The Court observed,

"The examples given above are undoubtedly the exception now, but they are sufficiently widespread to be the object of concern. Unless a proper limitation upon custodial interrogation is achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future."

384 US at 447.

The next development regarding *Miranda* warnings with regard to Article I, section 12, occurred in 1990 in *State v. Smith*, 310 Or 1, 791 P2d 836 (1990). There, the court explained, citing *Magee*,

> "[i]n determining whether *Miranda*-like warnings were required by the Oregon Constitution, we must assess the extent to which defendant was 'in custody.' In Oregon, a defendant who is in 'full custody' must be given *Miranda*-like warnings prior to questioning."

*Smith*, 310 Or at 7 (footnote omitted). Most recently, the court explained in *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006):

> "Article I, section 12, provides, in part, that 'no person shall be * * * compelled in any criminal prosecution to testify against himself.' To protect a person's right against compelled self-incrimination under that section, this court has held that, before questioning, police must give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be 'compelling.' "

Tracing the historical roots of the *Miranda* rule under both the federal and state constitutions in light of the facts in this case is instructive for several reasons. First, as described more fully in the above paragraphs, the rule was intended by the United States Supreme Court as a prophylactic measure to address coercive police practices that occurred during the interrogation of criminal suspects in police stations or in other "police-dominated" environments. *Roble-Baker*, 340 Or at 641. In contrast, a disciplinary hearing proceeding presided over by a hearings officer within a prison setting is adjudicative in nature. It is far removed from the kinds of police-dominated environments and interrogative practices that the Court was concerned about. Indeed, this court has previously characterized the circumstances of a prison disciplinary hearing as essentially "civil in nature." *Archuletta v. OWCC*, 25 Or App 149, 152, 548 P2d 1006 (1976).

More particularly, the determination by the majority that Article I, section 12, requires the giving of *Miranda*

warnings in prison disciplinary hearings under the circumstances of this case is suspect in light of the interests protected by Article I, section 12. There is no evidence in this case that the hearings officer functioned as a police officer, criminal investigator, or prosecutor who "interrogated" defendant in the sense contemplated by *Miranda*. Also, there is no evidence that hearings officers in disciplinary rule proceedings in Oregon routinely trick or coerce inmates into making incriminating statements or compel them to incriminate themselves for purposes of subsequent criminal prosecutions. Because the state *Miranda* requirement was adopted by the Oregon Supreme Court to protect the same interests that the federal requirement is intended to protect—that is, to provide safeguards against police coercing or tricking suspects into making incriminating statements and to relieve courts of having to determine after the fact whether particular confessions were voluntary—any extension of that judge-made doctrine under the language of Article I, section 12, to different circumstances is unwarranted in the absence of the existence of the objectives that *Miranda* was intended to address.

That absence is further illustrated by the evidence in this case. "Article I, section 12, of the Oregon Constitution includes and guarantees to a defendant the common-law rule that before a confession or admission can be received in evidence the state must prove that it was voluntarily made without inducement from fear or promises." *Smith*, 301 Or at 697. The colloquy between defendant and the hearings officer, as quoted above, demonstrates conclusively that defendant's statements were made voluntarily. Defendant knew that he did not have to appear at the disciplinary hearing, he was told that he did not have to enter a plea to the allegation of a disciplinary rule violation, and when he initially indicated that he did not want to make a statement, the hearings officer replied, "Okay." It was only after defendant changed his mind and implicitly invited the hearings officer to make further inquiries by stating, "I'm essentially taking responsibility here" that the hearings officer asked questions that led to incriminating responses by defendant. In sum, there is not a shred of evidence that defendant was threatened or

coerced into making incriminating statements to the hearings officer or that his will to remain silent was overcome by some government investigative technique or practice.

Nonetheless, the majority reasons that defendant's statements were made under compelling circumstances, circumstances that, in its view, trigger the need to counteract what it considers are coercive practices. However, in *Roble-Baker*, the court explained that

> "in determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract. *See Magee*, 304 Or at 264-65 (recognizing that state *Miranda* requirement protects same interests as federal requirement); *Miranda v. Arizona*, 384 US 436, 455-57, 86 S Ct 1602, 16 L Ed 2d 694 (1966) (explaining that warnings are necessary to ensure that a person's statement is truly the product of free choice when that person is placed in an 'incommunicado police-dominated atmosphere')."

340 Or at 641. Here, there is no interest like the interest that *Miranda* was intended to protect. In contrast to the police practices that prompted the *Miranda* decision, defendant's statements to the hearings officer were clearly the product of his free choice, a fact that is directly at odds with the majority's implicit conclusion that the hearings officer conducted the sort of police-dominated interrogation that provides the potential for coerced and involuntary statements.

Left without any legally cognizable policy objective to be accomplished by its exercise of judicial fiat, the majority turns to *State v. Breazile*, 189 Or App 138, 74 P3d 1099 (2003), for support. In that case, the defendant made statements to corrections officials during an administrative investigation without first being advised of his rights under *Miranda*. The interrogation occurred in the investigator's office, and, most importantly, the defendant would have faced administrative sanctions if he had refused to report to the investigator's office. The issue, as it is here, was whether the defendant's statements should be admitted into evidence in a subsequent criminal proceeding. We concluded that, under the circumstances existing in that case,

"a reasonable person in defendant's situation would have understood that he was being questioned under compelling circumstances. Because *Miranda* warnings were first required, Article I, section 12, of the Oregon Constitution requires the suppression of defendant's statements in this criminal prosecution."

189 Or App at 147.

The factual differences between this case and *Breazile* compel a different conclusion than the one we reached in *Breazile*. Defendant was aware that he did not have to attend the disciplinary hearing and that there was no official sanction if he failed to attend, although he recognized that it was in his best interests to do so. Defendant acknowledged to the hearings officer that he had previously received a copy of the misconduct report and a notice of hearing, inmate rights, and rules of prohibited conduct. When asked if he understood his rights, defendant replied, "I think so." The hearings officer then responded, "Okay. Well, if you have any questions, feel free to ask me, alright?" When defendant was informed of the pleas that he could enter and appeared to commence an explanation without entering a plea, he was cautioned by the hearings officer, "I'll take a statement from you after I receive your plea." Significantly, defendant responded, "Oh, you don't even have to really worry about that. I don't think I really want to give a statement." In light of defendant's statements, no objectively reasonable person could plausibly maintain that he understood that the circumstances of his questioning compelled responses to the hearings officer's questions, much less incriminating responses. Those facts are in direct contrast to the facts in *Breazile*, where the defendant was sent to a prison official's office, he faced administrative sanctions if he refused to report after being ordered to report, he was interrogated in the presence of three investigators, and he was not told that he could leave at any time.

Some final thoughts: Normally, our court is an intermediate appellate court—an error correcting court—not a policy-making court. But, in this case, the issue is how far to extend a policy-driven, judge-made rule. Today, the majority makes policy based not on existing Article I, section 12, precedent or established historical objectives, but, apparently, on

a perceived need to protect prison inmates during disciplinary hearings from the consequences of voluntarily making incriminating statements.[4] Sometimes, cases, because of their inherent injustices, cry out for the need for courts to establish policy because otherwise those injustices will not be remedied. For instance, I would be the first to agree that the efficacy of the Fifth Amendment guarantee against self-incrimination would have continued to be subject to abuse if the established coercive police practices mentioned in *Miranda* had not been addressed by the Court. I also agree that compelling circumstances tantamount to custodial interrogation existed in *Breazile* that warranted the application of the *Miranda* rule to that case; for example, the defendant could have been sanctioned for not reporting to the investigator's office.

But the circumstances in this case—that is, a prison disciplinary hearing conducted under administrative rules, a hearings officer who informs defendant that he is not required to make any statement, and a defendant who makes the decision to explain his involvement with the contraband found in his cell to spare his cellmate from any responsibility—are significantly different from those circumstances that *Miranda* warnings were intended to counteract.

In sum, the majority is incorrect when it believes that Article I, section 12, compels the extension of the *Miranda* rule to prison disciplinary hearings because the interests that the federal *Miranda* requirement protects are not at stake. That understanding leads me to emphatically dissent to what amounts to a novel ruling by this court that has no basis in case law decided under Article I, section 12, or the policy objectives that it advances.

---

[4] One logical ramification of the majority's rule is that, if prosecutors wish to use statements made by inmates during prison disciplinary hearings in subsequent criminal proceedings, then, upon request, the Department of Corrections will have to furnish attorneys to inmates at public expense before any statements are received in the hearing.